b6
b7C

From:       Caproni, Valerie E.
Sent:       Tuesday, January 24, 2006 4:07 PM
To:     b6  Monaco, Lisa O.
Subject:    b7C  RE: GENERAL MICHAEL HAYDEN (USAF) DELIVERS REMARKS AT THE NATIONAL
            PRESS CLUB ON NSA DOMESTIC SURVEILLANCE

Yikes

b6  -----Original Message-----
b7C From:
Sent: Tuesday, January 24, 2006 3:54 PM
To: Caproni, Valerie E.
Subject: Re: GENERAL MICHAEL HAYDEN (USAF) DELIVERS REMARKS AT THE NATIONAL PRESS CLUB ON
NSA DOMESTIC SURVEILLANCE

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 4/20/07 BY 65179 DMH/RcB/SAc

No - altho his (non) response to question at end (p16) re pc standard leaves impression
that program lowers standard

-----Original Message-----
b6  From: Caproni, Valerie E.
b7C To:
Sent: Tue Jan 24 15:46:32 2006
Subject: RE: GENERAL MICHAEL HAYDEN (USAF) DELIVERS REMARKS AT THE NATIONAL PRESS CLUB ON
NSA DOMESTIC SURVEILLANCE

Anything of concern?

b6  -----Original Message-----
b7C From:
Sent: Tuesday, January 24, 2006 1:40 PM
To: Caproni, Valerie E.
Subject: FW: GENERAL MICHAEL HAYDEN (USAF) DELIVERS REMARKS AT THE NATIONAL PRESS CLUB ON
NSA DOMESTIC SURVEILLANCE

fyi

b6  -----Original Message-----
b7C From:
Sent: Tuesday, January 24, 2006 11:04 AM
To:
Subject: GENERAL MICHAEL HAYDEN (USAF) DELIVERS REMARKS AT THE NATIONAL PRESS CLUB ON NSA
DOMESTIC SURVEILLANCE

From Lexis-Nexis

January 23, 2006 Monday

TYPE: NEWS EVENT

LENGTH: 9025 words

HEADLINE: GENERAL MICHAEL HAYDEN (USAF) DELIVERS REMARKS AT THE NATIONAL PRESS CLUB ON NSA
DOMESTIC SURVEILLANCE

SPEAKER:
GENERAL MICHAEL HAYDEN (USAF), PRINCIPAL DEPUTY DIRECTOR OF NATIONAL INTELLIGENCE

LOCATION: WASHINGTON, D.C.

BODY:



DEPUTY DIRECTOR HAYDEN DELIVERS REMARKS AT THE NATIONAL
PRESS CLUB ON NSA DOMESTIC SURVEILLANCE

JANUARY 23, 2006

SPEAKER: GENERAL MICHAEL HAYDEN (USAF),
PRINCIPAL DEPUTY DIRECTOR OF NATIONAL INTELLIGENCE


HAYDEN: Good morning. I'm happy to be here to talk a bit about what American intelligence
has been doing, and especially what NSA has been doing, to defend the nation.

Now, as Keith points out, I'm here today not only as Ambassador John Negroponte's deputy
in the Office of the Director of National Intelligence, I'm also here as the former
director of the National Security Agency, a post I took in March of 1999 and left only
last spring.

Serious issues have been raised in recent weeks. And discussion of serious issues should
be based on facts.

There's a lot of information out there right now. Some of it is, frankly, inaccurate. Much
of it is just simply misunderstood.

I'm here to tell the American people what NSA has been doing and why and, perhaps more
importantly, what NSA has not been doing.

Now, admittedly, this is a little hard to do while protecting our country's intelligence
sources and methods. And, frankly, people in my line of work generally don't like to talk
about what they've done until it becomes a subject on The History Channel.

But let me make one thing very clear: As challenging as this morning might be, this is the
speech I want to give. I much prefer being here with you today telling you about the
things we have done when there hasn't been an attack on the homeland.

This is a far easier presentation to make than the ones I had to give four years ago,
telling audiences like you what we hadn't done in the days and months leading up to the
tragic events of September 11th.

Today's story isn't an easy one to tell in this kind of unclassified environment. But it
is by far the brief I prefer to present.

Now, I know we all have searing memories of the morning of September 11th. I know I do:
making the decision to evacuate nonessential workers at NSA while the situation was still
unclear; seeing the NSA counterterrorist shop in tears while we were tacking up blackout
curtains around their windows; like many of you, making that phone call, asking my wife to
find our kids and then hanging up the phone on her.

HAYDEN: Another memory for me comes two days later -- that's the 13th of September -- when
I addressed the NSA workforce to lay out our mission in a new environment. It was a short
video talk. We beamed it throughout our headquarters at Fort Meade and globally throughout
our global enterprise.

Now, most of what I said was what anyone would expect.

I tried to inspire. Our work was important. The nation was depending on us.

I tried to comfort. "Look on the bright side," I had said to them. "Right now, a quarter
billion Americans wish they had your job, being able to go after the enemy."

I ended the talk by trying to give a little perspective. I noted that all free peoples
have had to balance the demands of liberty with the demands of security. And historically,
we Americans have been able to plant our flag well down the spectrum toward liberty.

"Here was our challenge," I said -- and I'm quoting from that presentation -- "We are

going to keep America free by making Americans feel safe again."

But to start the story with that Thursday, September 13th, is a bit misleading. It's a little bit like coming in near the end of the first reel of a movie. To understand that moment and that statement, you would have to know a little bit about what had happened to the National Security Agency in the preceding years.

Look, NSA intercepts communications and it does so for only one purpose: to protect the lives, the liberties and the well-being of the citizens of the United States from those who would do us harm.

HAYDEN: By the late 1990s, that job was becoming increasingly more difficult. The explosion of modern communications, in terms of volume, variety, velocity, threatened to overwhelm us.

The agency took a lot of criticism in those days, I know: criticism that it was going deaf, that it was ossified in its thinking, that it had not and could not keep up with the changes in modern communications.

And all of that was only reinforced when all the computer systems at Fort Meade went dark for three days in January of 2000 and we couldn't quickly or easily explain why.

Those were really interesting times. As we were being criticized for being incompetent and going deaf, at the same time, others seemed to be claiming that we were omniscient and we were reading your e-mails.

The Washington Post and New Yorker magazine during time -- I'm talking 1999 now, 2000 -- they wrote incorrectly that, and I'm quoting, "NSA has turned from eavesdropping on the communists to eavesdropping on businesses and private citizens." And that -- and I'm quoting again -- "NSA has the ability to extend its eavesdropping network without limits."

We were also referred to as a, quote, "global spying network that can eavesdrop on every single phone call, fax or e-mail anywhere on the planet."

I used those quotes in a speech I gave at American University in February of 2000.

HAYDEN: The great urban legend out there then was something called Echelon, and the false accusation that NSA was using its capabilities to advance American corporate interests: signals intelligence for General Motors or something like that.

You know, with these kinds of charges, the turf back then feels a bit familiar now. How could we prove a negative, that we weren't doing certain things, without revealing the appropriate things we were doing that kept America safe?

You see, NSA had -- NSA has -- an existential problem. In order to protect American lives and liberties, it has to be two things: powerful in its capabilities and secretive in its methods. And we exist in a political culture that distrusts two things most of all: power and secrecy.

Modern communications didn't make this any easier. Gone were the days when signals of interest -- that's what NSA calls the things that they want to copy -- gone were the days when signals of interest went along some dedicated microwave link between Strategic Rocket Force's headquarters in Moscow and some ICBM base in western Siberia.

By the late '90s, what NSA calls targeted communications -- things like Al Qaida communications -- coexisted out there in a great global web with your phone calls and my e-mails. NSA needed the power to pick out the ones, and the discipline to leave the others alone.

So this question of security and liberty wasn't a new one for us in September of 2001. We've always had this question: How do we balance the legitimate need for foreign intelligence with our responsibility to protect individual privacy rights?

It's a question drilled into every employee of NSA from day one, and it shapes every decision about how NSA operates.

September 11th didn't change that.

HAYDEN: But it did change some things.

This ability to intercept communications -- we commonly refer to it as signals intelligence, or SIGINT -- SIGINT is a complex business, with operational and technological and legal imperatives often intersecting and overlapping.

There's routinely some freedom of action within the law to adjust operations. After the attacks, I exercised some options I've always had that collectively better prepared us to defend the homeland.

Let me talk for a minute about this, because a big gap in the current understanding -- a big gap in the current debate -- is what's standard. What is that NSA does routinely?

Where we set the threshold, for example, for what constitutes inherent foreign intelligence value -- that's what we're directed to collect; that's what we're required to limit ourselves to; inherent foreign intelligence value -- where we set that threshold, for example, in reports involving a U.S. person shapes how we do our job, shapes how we collect, shapes how we report.

The American SIGINT system in the normal course of its foreign intelligence activities inevitably captures this kind of information: information to, from or about what we call a U.S. person.

HAYDEN: And by the way, "U.S. person" routinely includes anyone in the United States, citizen or not.

So, for example, because they were in the United States and we did not know anything more, Mohammed Atta and his fellow 18 hijackers would have been presumed to have been protected persons, U.S. persons, by NSA prior to 9/11.

Inherent foreign intelligence value is one of the metrics we must use -- I'm going to repeat that: Inherent foreign intelligence value is one of the metrics we must use to ensure that we conform to the Fourth Amendment's reasonableness standard when it comes to protecting the privacy of these kinds of people.

If the U.S. person information isn't relevant, the data is suppressed. It's a technical term we use, we call it "minimized." The individual is not even mentioned. Or if he or she is, he or she is referred to as U.S. person number one or U.S. person number two.

Now, inherent intelligence value. If the U.S. person is actually the named terrorist, well, that could be a different matter. The standard by which we decided that, the standard of what was relevant and valuable -- and, therefore, what was reasonable -- would, understandably, change, I think, as smoke billowed from two American cities and a Pennsylvania farm field.

And we acted accordingly.

To somewhat oversimplify this, this question of inherent intelligence value, just by way of illustration, to just use an example, we all had a different view of Zacarias Moussaoui's computer hard drive after the attacks than we did before.

HAYDEN: Look, this is not unlike things that happened in other areas.

Prior to September 11th, airline passengers were screened in one way. After September 11th, we changed how we screen passengers.

In the same way, although prior to September 11th certain communications weren't considered valuable intelligence, it became immediately clear after September 11th that intercepting and reporting these same communications were, in fact, critical in defending the homeland.

Now, let me make this point: These decisions were easily within my authorities as the director of NSA under an executive order known as Executive Order 12333 that was signed in 1981, an executive order that has governed NSA for nearly a quarter century.

Now, let me summarize: In the days after 9/11, NSA was using its authorities and its

judgment to appropriately respond to the most catastrophic attack on the homeland in the history of the nation.

That shouldn't be a headline. But as near as I can tell, these actions on my part have created some of the noise in recent press coverage.

And let me be clear on this point: Except that they involved NSA, these programs were not related -- these programs were not related to the authorization that the president has recently spoken about.

Back then, September 2001, I asked to update the Congress on what NSA had been doing and I briefed the entire House Intelligence Committee on the 1st of October on what we had done under our previously existing authorities.

HAYDEN: Now, as another part of our adjustment, we also turned on the spigot of NSA reporting to FBI in, frankly, an unprecedented way.

We found that we were giving them too much data in too raw form. We recognized it almost immediately, a question of weeks, and we made all of the appropriate adjustments.

Now, this flow of data to the FBI has also become part of the current background noise. And despite reports in the press of "thousands of tips a month," our reporting has not even approached that kind of pace.

You know, I actually find this a little odd. After all the findings of the 9/11 Commission and other bodies about the failure to share intelligence, I'm up here feeling like I have to explain pushing data to those who might be able to use it.

And, of course, it's the nature of intelligence that many tips lead nowhere, but you have to go down some blind alleys to find the tips that pay off.

Now, beyond the authorities that I exercised under the standing executive order, as the war on terror has moved forward, we have aggressively used FISA warrants.

The act and the court have provided us with important tools and we make full use of them. Published numbers show us using the court at record rates. And the results have been outstanding.

But the revolution in telecommunications technology has extended the actually impact of the FISA regime far beyond what Congress could ever have anticipated in 1978. And I don't think that anyone could make the claim that the FISA statute is optimized to deal with or prevent a 9/11 or to deal with a lethal enemy who likely already had combatants inside the United States.

HAYDEN: I testified in open session to the House Intel Committee in April of the year 2000. At the time, I created some looks of disbelief when I said that if Osama bin Laden crossed the bridge from Niagara Falls, Ontario, to Niagara Falls, New York, there were provisions of U.S. law that would kick in, offer him protections and affect how NSA could now cover him.

At the time, I was just using this as some sort of stark hypothetical. Seventeen months later, this is about life and death.

So now we come to one additional piece of NSA authorities. These are the activities whose existence the president confirmed several weeks ago. That authorization was based on an intelligence community assessment of a serious and continuing threat to the homeland. The lawfulness of the actual authorization was reviewed by lawyers at the Department of Justice and the White House, and was approved by the attorney general.

Now, you're looking at me up here, and I'm in a military uniform. And frankly, there's a certain sense of sufficiency here: authorized by the president, duly ordered, its lawfulness attested to by the attorney general and its content briefed to the congressional leadership.

But we all have personal responsibility. And in the end, NSA would have to implement this. And every operational decision the agency makes is made with the full involvement of its legal office.

NSA professional career lawyers -- and the agency has a bunch of them -- have a well-deserved reputation. They're good. They know the law. And they don't let the agency take many close pitches.

And so, even though I knew the program had been reviewed by the White House and by DOJ, by the Department of Justice, I asked the three most senior and experienced lawyers in NSA. "Our enemy in the global war on terrorism doesn't divide the United States from the rest of the world. The global telecommunications system doesn't make that distinction, either. Our laws do, and should." How did these activities square with these facts?

They reported back to me that they supported the lawfulness of this program; supported, not acquiesced. This was very important to me.

A veteran NSA lawyer, one of the three I asked, told me that a correspondent had suggested to him recently that all the lawyers connected with this program had been very careful from the outset, because they knew there would be a day of reckoning.

The NSA lawyer replied to him that that had not been the case. "NSA had been so careful," he said -- and I'm using his words now, here, "NSA had been so careful because in this very focused, limited program, NSA had to ensure that it dealt with privacy interests in an appropriate manner."

In other words, our lawyers weren't careful out of fear. They were careful out of a heartfelt, principled view that NSA operations had to be consistent with bedrock legal protections.

In early October 2001, I gathered key members of the NSA workforce in our conference room and I introduced our new operational authorities to them. With the historic culture of NSA being what it was and is, I had to do this personally.

I told them what we were going to do and why.

HAYDEN: I also told them that we were going to carry out this program and not go one step further.

NSA's legal and operational leadership then went into the details of this new task.

You know, the 9/11 Commission criticized our ability to link things happening in the United States with things that were happening elsewhere. In that light, there are no communications more important to the safety of this country than those affiliated with Al Qaida with one end in the United States.

The president's authorization allows us to track this kind of call more comprehensively and more efficiently. The trigger is quicker and a bit softer than it is for a FISA warrant, but the intrusion into privacy is also limited: only international calls and only those we have a reasonable basis to believe involve Al Qaida or one of its affiliates.

The purpose of all of this is not to collect reams of intelligence, but to detect and prevent attacks.

The intelligence community has neither the time, the resources nor the legal authority to read communications that aren't likely to protect us. And NSA has no interest in doing so.

These are communications that we have reason to believe are Al Qaida communications: a judgment made by American intelligence professionals, not folks like me or political appointees; a judgment made by the American intelligence professionals most trained to understand Al Qaida tactics, Al Qaida communications and Al Qaida aims.

Their work is actively overseen by the most intense oversight regime in the history of the National Security Agency. The agency's conduct of this program is thoroughly reviewed by the NSA's general counsel and inspector general. The program has also been reviewed by the Department of Justice for compliance with the president's authorization.

HAYDEN: Oversight also includes an aggressive training program to ensure that all activities are consistent with the letter and the intent of the authorization and with the preservation of civil liberties.

6

Let me talk for a few minutes also about what this program is not.

It is not a drift net over Dearborn or Lackawanna or Freemont, grabbing conversations that we then sort out by these alleged keyword searches or data-mining tools or other devices that so-called experts keep talking about. This is targeted and focused.

This is not about intercepting conversations between people in the United States. This is hot pursuit of communications entering or leaving America involving someone we believe is associated with Al Qaida.

We bring to bear all the technology that we can to ensure that this is so. And if there were ever an anomaly and we discovered that there had been an inadvertent intercept of a domestic-to-domestic call, that intercept would be destroyed and not reported.

But the incident -- what we call inadvertent collection -- would be recorded and reported. But that's a normal NSA procedure. It's been our procedure for the last quarter century.

And as always, as we always do when dealing with U.S. person information, as I said earlier, U.S. identities are expunged when they're not essential to understanding the intelligence value of any report. Again, that's a normal NSA procedure.

So let me make this clear: When you're talking to your daughter at state college, this program cannot intercept your conversations. And when she takes a semester abroad to complete her Arabic studies, this program will not intercept your communications.

HAYDEN: Let me emphasize one more thing that this program is not.

Now, look, I know how hard it is to write a headline that's accurate and short and grabbing. But we really should shoot for all three: accurate, short and grabbing.

I don't think "domestic spying" makes it. One end of any call targeted under this program is always outside the United States.

I've flown a lot in this country, and I've taken literally hundreds of domestic flights. I have never boarded a domestic flight in the United States of America and landed in Waziristan.

In the same way -- and I'm speaking illustratively here now, this is just an example -- if NSA had intercepted Al Qaida ops chief Khalid Shaikh Mohammed in Karachi talking to Mohammed Atta in Laurel, Maryland, in, say, July of 2001, if NSA had done that and the results had been made public, I'm convinced that the crawl on all the 7x24 new networks would not have been, "NSA domestic spying."

Had this program been in effect prior to 9/11, it is my professional judgment that we would have detected some of the 9/11 Al Qaida operatives in the United States and we would have identified them as such.

I've said earlier that this program's been successful. Clearly, not every lead pans out from this or any other source, but this program has given us information that we would not otherwise have been able to get.

It's impossible for me to talk about this anymore in a public way without alerting our enemies to our tactics or what we have learned.

HAYDEN: I can't give details without increasing the danger to Americans. On one level, believe me, I wish that I could. But I can't.

Our enemy has made his intentions clear. He's declared war on us. Since September 11th, Al Qaida and its affiliates have continued to announce their intention, continued to act on their clearly stated goal of attacking America.

They have succeeded against our friends in London, Madrid, Bali, Amman, Istanbul and

7

elsewhere. They desperately want to succeed against us.

The 9/11 Commission told us -- and I'm quoting them now -- "Bin Laden and Islamist terrorists mean exactly what they say. To them, America is the font of all evil at the head of the snake and it must be converted or destroyed."

Bin Laden reminded us of this intention as recently as last Thursday.

The people at NSA and the rest of the intelligence community are committed to defend us against this evil and to do it in a way consistent with our values.

We know that we can only do our jobs if we have the trust of the American people. And we can only have your trust if we are careful about how we use our tools and our resources.

That sense of care is part of the fabric of the community I represent. It helps define who we are.

I recently went out to Fort Meade to talk to the workforce involved in this program. They know what they have contributed. And they know the care with which it has been done.

Even in today's heated environment, the only concern they expressed to me was continuing their work in the defense of the nation and continuing to do so in a manner that honors the law and the Constitution.

As I was talking with them -- we were in the office spaces there: typical office spaces anywhere in the world -- I looked out over their heads. And this is the workforce that deals with the program the president discussed several weeks ago.

I looked out over their heads to see a large sign affixed to one of those pillars that go up through our operations building that breaks up the office space. That sign is visible from almost anywhere in this large area.

HAYDEN: It's yellow with bold black letters on it. The title was readable from 50 feet: "What Constitutes a U.S. Person?" And that title was followed by a detailed explanation of the criteria.

That has always been the fundamental tenet of privacy for NSA. And here it was in the center of a room, guiding the actions of a workforce determined to prevent another attack on the United States.

Security and liberty, the people at NSA know what their job is.

I know what my job is, too. I learned a lot from NSA and it's culture during my six years there.

But I come from a culture, too. I've been a military officer for nearly 37 years. And from the start, I've taken an oath to protect and defend the Constitution of the United States. I would never violate that Constitution, nor would I abuse the rights of the American people.

As the director, I was the one responsible to ensure that this program was limited in its scope and disciplined in its application.

American intelligence, and especially American SIGINT -- signals intelligence -- is the front line of defense in dramatically changed circumstances, circumstances in which if we fail to do our job well and completely more Americans will almost certainly die.

The speed of operations, the ruthlessness of the enemy, the pace of modern communications have called on us to do things and to do them in ways never before required.

HAYDEN: We've worked hard to find innovative ways to protect the American people and the liberties we hold dear, and in doing so, we have not forgotten who we are either.

Thank you. I'll be happy to take your questions.

QUESTION: General, how do you explain the fact that there were several rare spectacles of whistleblowers coming forward at NSA, especially after 9/11, something that hasn't really

8

happened in the past, who have complained about violations of FISA and United States Signals Intelligence Directive 18, which implements the law at the agency?

HAYDEN: I talked to the NSA staff on Friday. The NSA inspector general reports to me, as of last Friday, from the inception of this program through last Friday night.

Not a single employee of the National Security Agency has addressed a concern about this program to the NSA I.G.

HAYDEN: I should also add that no member of the NSA workforce who has been asked to be included in this program has responded to that request with anything except enthusiasm.

I don't know what you're talking about.

QUESTION: General Hayden, the FISA law says that the NSA can do intercepts, as long as you go to the court within 72 hours to get a warrant. I understood you to say that you are aggressively using FISA, but selectively doing so.

Why are you not able to go to FISA as the law requires in all cases? And if the law is outdated, why haven't you asked Congress to update it?

HAYDEN: Lots of questions contained there, and let me try them one at a time.

First of all, and I need to get the statement of fact out here, all right?

Under the FISA statute, NSA cannot put someone on coverage and go ahead and play for 72 hours while it gets a note saying it was OK, all right?

The attorney general is the one who approves emergency FISA coverage. And the attorney general's standard for approving FISA coverage is a body of evidence equal to that which he would present to the court. So it's not like you can throw it on for 72 hours.

I've talked in other circumstances -- I've talked this morning about how we've made very aggressive use of FISA. If you look at NSA reporting under this program, you know, without giving you the X or Y axis on the graph, NSA reporting under this program has been substantial, but consistent. This is NSA counterterrorism reporting: substantial but consistent.

NSA reporting under FISA has gone like that. FISA's been a remarkably successful tool. We use it very aggressively.

In the instances where this program applies, FISA does not give us the operational effect that the authorities that the president has given us give us.

HAYDEN: Look, and I understand. It's going to be an incomplete answer and I can't give you all the fine print as to why. But let me just, kind of, reverse the answer just a bit.

If FISA worked just as well, why wouldn't I use FISA? To save typing? No.

There is an operational impact here. And I have two paths in front of me, both of them lawful: one FISA, one the president's authorization. And we go down this path because our operational judgment is it is much more effective.

So we do it for that reason.

I think I've covered all the ones you raised.

QUESTION: Are you saying that the sheer volume of warrantless eavesdropping has made FISA inoperative?

HAYDEN: No. I'm saying that the characteristics we needs to do what this program is designed to do -- to detect and prevent -- make FISA a less useful tool

A wonderful tool, it's done wonderful things for the nation in terms of fighting the war on terror. But in this particular challenge, this particular aspect, detect and prevent attacks, what we're doing now is operationally more relevant, operationally more effective.

QUESTION: You just now spoke of, quote, "two paths." But, of course, the FISA statute itself says that it will be the exclusive means by which electronic surveillance may be pursued.

Are you not, therefore, violating the law?

HAYDEN: That's probably a question I should deflect to the Department of Justice.

But as I said in my comments, I have an order whose lawfulness has been attested to by the attorney general, an order whose lawfulness has been attested to by NSA lawyers who do this for a living.

No, we're not violating the law.

QUESTION: You cited before the congressional powers of the president. Are you asserting inherent so-called constitutional powers that -- to use the term that came up in the Alito hearings -- a unitary executive has to violate the law when he deems fit?

HAYDEN: I'm not asserting anything. I'm asserting that NSA is doing its job.

QUESTION: General, first, thank you for your comments. And I think you somewhat answered this in your response, and this goes to the culture and just to the average American.

Let me just say this: that domestic spying and the faith communities are outraged. Churches in Iowa, churches in Nebraska, mosques across the board are just outraged by the fact that our country could be spying on us.

You made a point that the young lady at State Penn shouldn't have to worry, but we're worried that our country has begun to spy on us.

We understand the need for terrorism and the need to deal with that. But what assurances, and how can you answer this question: What can make Americans feel safe? How can the faith community feel safe that their country is not spying on them for any reason?

HAYDEN: Reverend, thanks for the question.

I'm part of a faith community, too.

And I've laid it out as well as I could in my remarks here as to how limited and focused this program is, what its purpose is, that it's been productive.

HAYDEN: We are not out there -- and, again, let me use a phrase I used in the comments. This isn't a drift net out there where we're soaking up everyone's communications. We are going after very specific communications that our professional judgment tells us we have reason to believe are those associated with people who want to kill Americans. That's what we're doing.

And I realize the challenge we have. I mentioned earlier the existential issue that NSA has, well before this program, that it's got to be powerful if it's going to protect us. And it's also got to be secretive if it's going to protect us. And that creates a tremendous dilemma; I understand that.

I'm disappointed, I guess, that perhaps the default response for some is to assume the worst. I'm trying to communicate to you that the people who are doing this go shopping in Glen Burnie and their kids play soccer in Laurel and they know the law. They know American privacy better than the average American, and they're dedicated to it.

So I guess the message that I ask you to take back to your communities is the same one I take back to mine: This is focused, it's targeted, it's very carefully done; you shouldn't worry.

QUESTION: Just, though, General, that the faith communities will take that back, but the faith communities are scared. Where does this stop?

QUESTION: How was national security harmed by the New York Times reporting on this program? Don't the bad guys already assume that they're being monitored anyway? And

shouldn't Americans bear in mind that they might be at any time?

HAYDEN: You know, we've had this question asked several times.

Public discussion of how we determine Al Qaida intentions, I just -- I can't see how that can do anything but harm the security of the nation.

HAYDEN: And I know people say, "Oh, they know they're being monitored." Well, you know, they don't always act like they know they're being monitored. But if you want to shove it in their face constantly, it's bound to have an impact.

And so, I understand the reverend's question just raised. There are issues here that the American people are deeply concerned with.

But constant revelations and speculation and connecting the dots in ways that I find unimaginable and laying that out there for our enemy to see cannot help but diminish our ability to detect and prevent attacks.

QUESTION: We've read numerous reports in the Times and other papers about massive spying by the NSA on millions of people, along with reports of rendition, torture, et cetera.

And I attended Congressman Conyers' hearings on Friday, where a gentleman came from South Florida, talking about how military intelligence went and infiltrated his Quaker peace group and that this -- they later saw the documents detailing that.

And I guess I have two questions for you.

One is, as a participant in a group called The World Can't Wait: Drive Out the Bush Regime, which is organizing for people to drown out Bush's lies during the State of the Union and to gather on February 4th, demanding that Bush step down, my question is this: Are you or the NSA -- when I say "you," I mean the NSA in its entirety -- is it intercepting our e-mail communications, listening to our telephone conversations, et cetera?

Because, as Bush has said, you're either against us or you're with us. And they have asserted that whatever the president wants to do in time of war, whether it's holding people without charges or writing memos justifying torture, they can do that.

My second question is this, related to that: I publicly challenge you and the NSA to a public, open debate that people can gather and listen to your responses, a debate on this warrantless wiretapping and spying on millions of people that have gone on across this country.

QUESTION: Because, as the reverend said, millions and millions of people are outraged. That is why people are talking impeachment; that is why people are demanding that Bush step down, because of this massive spying, the torture, the rendition and everything else.

So I challenge you to a public and open debate on these questions.

HAYDEN: What was the question?

QUESTION: Will you openly and publicly debate us -- myself -- in a forum that's open to the public, not restricted, on the NSA spying scandal, and defend what has been said and respond to the numerous reports about the NSA spying on millions of people? That is one question.

And the second question is, are you spying on or intercepting our communications, e-mails and telephone conversations, of those of us who are organizing the World Can't Wait: Drive Out the Bush Regime?

HAYDEN: You know, I tried to make this as clear as I could in my prepared remarks.

I said this isn't a drift net. I said we're not out there sucking up coms and then using some of these magically alleged keyword searches. "Did he say jihad?"

Do you know how much time Americans spend on the phone in international calls alone? In 2003, our citizenry was on the phone in international calls alone for 200 billion minutes.

I mean, beyond the ethical considerations involved here, there are some practical considerations about being a drift net.

This is targeted. This is focused. This is about Al Qaida.

The other request, about a public debate, as I mentioned at the beginning of my prepared remarks, this is a somewhat uncomfortable position for someone in my profession to be in, laying out details of the program.

HAYDEN: One way of describing what you have invited me to would be, "Why don't you come out and tell the world how you're catching Al Qaida?" And I can't do that; that would be professionally irresponsible.

QUESTION: No, I asked: Are you targeting us and people who politically oppose the Bush administration? Not a fishing net, but are you targeting specifically political opponents of the Bush administration?

Because as Vice President Gore recently said, "It is much worse than people realize."

QUESTION: Good morning. General Hayden. Questions in two areas for you.

One, can you describe a little further who the targets of these collection are? Are you looking at individuals or are you looking at phone numbers, Web sites, e-mail addresses?

And then, separately, you described two separate programs authorized after 9/11, or undertaken after 9/11, one by you, one by President Bush. Can you explain how the two relate?

HAYDEN: Sure, thanks for the opportunity -- I'm sorry, how the two relate?

QUESTION: How the two relate.

HAYDEN: Yes, thanks.

To, kind of, summarize about the changes I did, that was essentially just downshifting. I mean, it was shifting the weight of the agency in the direction of targets that were suddenly more important. And the degree of reporting we were doing on those targets changed. Again, all within my authorities.

The relationship between what I did and what I briefed the entire House Select Committee on Intelligence on on the 1st of October, the relationship between that and what the president was authorized, was simply that it involved NSA and it involved the war on terrorism. But that's the only connective tissue.

Your first question: Are these individuals, are these phone numbers, are these e-mail accounts and so on? Hard for me to get into the specifics.

I would just say that what it is we do is that we use our art form, we use our science and our art to, as best as we can, specifically target communications we have reason to believe are associated with Al Qaida.

HAYDEN: And we use all the tools available to us to do that.

QUESTION: So you can't be any more specific then that...

HAYDEN: No.

QUESTION: ... as to whether it's focused on individuals or phone numbers?

HAYDEN: I would love to, but I can't.

QUESTION: General, you said that if this program had been in place before 9/11, you're pretty confident that you would have detected at least some of the hijackers' presence in the United States and maybe have stopped the attack.

If that's the case, why is this limited to communications where one person is overseas?

Isn't it even more urgent if you've got communications within the United States between two people who might have Al Qaida links? And why aren't you pursing that?

And a second, sort of, linked question is: On the 72 hours, if what you said is true, if I understood it, then I and I think a lot of other reporters have been misreporting this. Can you explain on the 72 hours the lack of the free press, because you said it's not true, but you didn't explain why it's not true?

HAYDEN: I'm sorry. To be very clear, we throw the language out and we all maybe lose precision as we do it.

NSA just can't go up on a number for 72 hours while it finishes out the paperwork. The attorney general is the only one who can authorize what's called an emergency FISA. That's what we're talking about there, all right? So my point was that's not something that NSA, under the FISA act, can do on its own.

The first question was, I'm sorry?

QUESTION: Just a quick follow-up on that, I mean, can it be as quick as you call the attorney general -- or the NSA director calls the attorney general, says, "We've got to go up now," and he says, "OK, fill out the paperwork"?

HAYDEN: The standard the attorney general must have is that he has sufficient evidence in front of him that he believes he can substantiate that in front of the FISA court.

But you had the first question, though?

QUESTION: OK, the first question was regarding potentially having been able to.

HAYDEN: Oh, yes, I'm sorry.

QUESTION: Why isn't it even more urgent to monitor communications of two Al Qaida folks within the United States?

HAYDEN: Primarily because NSA is a foreign intelligence agency. And this is about -- what we've talked about here today is about foreign intelligence.

It's also about, as I tried to suggest in my comments, a balancing between security and liberty.

And one of the decisions that have been made collectively -- and, certainly, I personally support it -- is that one way we have balanced this is that we are talking about international communications. So it not only plays to the strength of NSA; it's an attempt to balance these consistent, continuing, legitimate questions of security and liberty.

If we were to be drilled down on a specific individual to the degree that the judgment was, "We need all coms. We need domestic-to-domestic," that's the route we go through the FISA court in order to do that.

QUESTION: Two questions, if I could.

One, I wanted to try to make sure I understand something. I thought I heard you say that the surveillance, domestically, going on under FISA has been expanding rapidly. That's publicly reported, at least the numbers.

HAYDEN: Right.

QUESTION: And that the quantity of the surveillance under the presidentially approved program has been about a steady state.

I thought I understood you to be suggesting that the former was numerically greater -- quantitatively a much greater surveillance program than the presidentially authorized one.

HAYDEN: Sorry; thank you for allowing me to clarify this. What I was talking about was effect, was product, was result.

And the presidential authorization has been a steady producer. The point I wanted to make

was, as we have moved forward on the war on terrorism, FISA has been increasingly effective in terms of results.

QUESTION: And then a different kind of question now on the congressional consultation issue.

There are many things, it seems to me that presidents can assert they can do without congressional approval. Nevertheless, they seek congressional approval.

There are presidents who have consistently argued that the War Powers Act does not apply, that they have the power to send troops into action, et cetera. And yet it's felt that, for the sense of national unity, the correct thing to do is to go to Congress and get approval.

You've laid out an argument today -- the urgency of the situation, the reasonableness, the numerous lawyers who have approved this -- this would suggest strongly that, had it been presented to Congress, Congress would have approved it, would have agreed with the reasonableness of it.

And there's a suggestion that by not going to Congress except to merely inform a very limited number of members, the unspoken message was, "We don't feel we could have gotten the approval."

The other potential message is that the secret would have leaked out, which seems to be a disturbing message, if that's what you're saying, that the committees, the oversight committees, the intelligence oversight committees can't keep a secret.

Sorry for the long-windedness.

(LAUGHTER)

HAYDEN: Let me take a run, though.

We did brief Congress -- as you know, it's been announced -- more than a dozen times. I've been the briefer. Every time that's happened, I've been there.

And my intent there, in ways less restricted than I've had to operate here, was to make sure that the people in the room fully understood what had been authorized and what we had been doing.

HAYDEN: One additional aspect that I would suggest to you that I think is very important is that -- and I will take no view on the political step of going to Congress for an amendment of the FISA act and so on and so forth, but I will offer you an operational point.

And the operation point is this: If we had done that, if we will do that, if we were to do that, I would hope we would do it in such a way that the legitimate debate and legitimate discussions of that step do not betray to the enemy the tactics, techniques and procedures that we are now using to detect them.

QUESTION: You said that you used your top counsel in the planning process to tell you if this was legal and appropriate back in 2001. What exactly did your counsel tell you that it was within guidelines and within the law, constitutional law?

HAYDEN: Yes, I think my counsel, if he were here, would be whispering something about privilege, lawyer-client language.

I can tell you in general -- and we talked about this in a bit more detail -- they came back rather emphatically -- and I did it to three; and I did it to three separately and serially, so it wasn't a group answer.

And all three came back saying that they believed this was lawful, that it was a lawful order that had been authorized by the president, that was within his authorities to authorize this activity.

QUESTION: There's been lawsuits saying that it violates the First and the Fourth Amendment. And wasn't that before the Patriot Act was passed to give the president more

14

expanded powers?

HAYDEN: I honestly don't know. I'm not sure of the sequencing.

QUESTION: OK. But you can't say what laws...

HAYDEN: The arguments that they use?

QUESTION: Yes.

HAYDEN: No. These guys are experts on the FISA act. They're expert on something called USID-18, which is, kind of, our library of instructions as to how to conduct SIGINT and protect privacy. They're also really expert on the Constitution, and they're really expert on the Fourth Amendment.

And so when I talked to them -- I mean, I said there was an error of sufficiency with what I had been given, but this was personal. And these are men that I'd worked with. These are men who had said, "No, you can't do that. No, we advise against doing that," in previous events, the preceding two and a half, three years I had been director.

And so they weren't freebies. They just didn't hand out hall passes for anything that might have been operationally effective or some things the agency might have wanted to do. They were hard. They were tough.

And so on a personal basis to me, when the three of them came back and said, "It's good to go," it meant a lot to me.

And it meant a lot to the agency, too. Because as I said, the agency had to implement this, and the agency does everything, everything with a lawyer looking over their shoulder.

We know what this is. This is electronic surveillance for a foreign intelligence purpose. We know what the Constitution says. And so it's done very, very carefully. And I was very heartened that I got that response from the senior legal team we had.

QUESTION: It wasn't necessary to get any more info from the DOJ? Or was your legal counsel all that you needed?

HAYDEN: This was personal. This was after -- or simultaneous with -- DOJ and White House averring to the lawfulness of the program.

QUESTION: Does NSA now, currently, listen to conversation from overseas to U.S. citizen travelling abroad or diplomats stationed abroad?

The other question, I want to quote you. You said you listened to individual or to the calls that we believe associated with Al Qaida, and you mentioned the issue of focused many times.

Now, how you reach the level of believing? I mean, give us just an indication, without divulging any secrets here, how it's determined. Because in the Arab and Muslim community, Arab-American and Muslim American in the United States, bin Laden was not able to recruit any one of them, but they feel that they are being profiled, under threat, under constant harassment, et cetera, et cetera.

So is it open season on the Arab-American and Muslim American in the United States that any conversation that it is believed to be associated with Al Qaida?

HAYDEN: Thank you very much for asking that question. That gives me an opportunity.

That's why I was almost so emphatic in my prepared remarks about this not being a drift net over parts of the United States and then we sort through by keywords or some other things. This is not this at all.

If we are intercepting a communication, it is because we have reason to believe that one or both communicants are affiliated with Al Qaida. That's our criteria.

QUESTION: Why they are not already in jail, General?

HAYDEN: Well, in some cases the communicant affiliated with Al Qaida is not in the United States.

Now, you asked earlier about, "How confident are you?" This is both art and science. We use every tool available to us. We have the best people at the National Security Agency and the best technology of the National Security Agency on this effort.

I don't want to be overly dramatic here, OK? I really don't.

HAYDEN: We use signals intelligence for a lot of things. We use signals intelligence to support America's armed forces.

The tools and techniques and tactics and procedures we use to determine, "Is this an Al Qaida communications?" are the same tools, techniques, tactics and procedures we use to tell America's armed forces that, "You can go ahead and put a 500-pound bomb on that target." It's the same art and science.

So this is not done -- what I'm saying is, this is not done idly.

QUESTION: OK. Just the first part of my question, I'm not -- yes, I'm not following it up -- the first part of my question.

MODERATOR: OK. I'm going to have to cut you off here. We have time for two more questions. And if you could keep them fairly brief, we'd appreciate it.

QUESTION: Yes, but...

MODERATOR: I'm sorry.

QUESTION: ... the first question that I asked, about U.S. citizen abroad.

HAYDEN: I'm sorry, I apologize, I didn't understand the question. That's the first question. I'm sorry.

QUESTION: Just to clarify, sort of, what's been said, from what I've heard you say here today and at an earlier press conference, the change from going around the FISA law was to -- one of them was to lower the standard from what they call for, which is basically probable cause, to a reasonable basis, and then to take it away from a federal court judge, the FISA court judge, and hand it over to a shift supervisor at NSA.

Is that what we're talking about here, just for clarification?

HAYDEN: You got most of it right. The people who make the judgment, and the one you just referred to, there are only a handful of people at NSA who can make that decision. They're all senior executives. They are all counterterrorism and Al Qaida experts.

So even though you actually quoted me back saying "shift supervisor," to be more precise, in what you just described the person who makes that decision, very small handful, senior executive. So in military terms, a senior colonel or general officer equivalent. And in professional terms, the people who know more about this than anyone else.

QUESTION: Well, no, that wasn't the real question.

The question I was asking, though, was, "since you lowered the standard, doesn't that decrease the protections of the U.S. citizens?

And, number two, if you could give us some idea of the genesis of this. Did you come up with the idea? Did somebody in the White House come up with the idea? Where did the idea originate from?

HAYDEN: Let me just take the first one, and I'm not going to talk about the process by which the president arrived at his decision.

HAYDEN: I think you've accurately described the criteria under which this operates. And I think I at least tried to accurately describe changed circumstance, threat to the nation, and why this approach -- limited, focused -- has been effective.

QUESTION: I'd like to stay on the same issue, and that has to do with the standard by which you use to target your wiretaps.

I'm no lawyer, but my understanding is that the Fourth Amendment to the Constitution specifies that you must have probable cause to be able to do a search that does not violate an American's right against unlawful searches and seizures. Do you use...

HAYDEN: The Fourth Amendment actually protects all of us against "unreasonable search and seizure." That's what it says.

QUESTION: But the measure is probable cause, I believe.

HAYDEN: The amendment says "unreasonable search and seizure."

QUESTION: But does it not say...

HAYDEN: No.

QUESTION: ... the court standard, the legal standard.

HAYDEN: The amendment says "unreasonable search and seizure."

QUESTION: The legal standard is probable cause, General.

You used the terms just a few minutes ago -- "We reasonably believe." And a FISA court, my understanding is, would not give you a warrant if you went before them and say, "We reasonably believe." You have to go to the FISA court or the attorney general has to go to the FISA court and say, "We have probable cause."

And so, what many people believe -- and I'd like you to respond to this -- is that what you've actually done is crafted a detour around the FISA court by creating a new standard of reasonably believe in place of probable cause, because the FISA court will not give you a warrant based on reasonable belief; you have to show probable cause.

Could you respond to that, please?

HAYDEN: Sure.

I didn't craft the authorization. I am responding to a lawful order, all right? The attorney general has averred to the lawfulness of the order.

Just to be very clear -- and believe me, if there's any amendment to the Constitution that employees of the National Security Agency are familiar with, it's the Fourth -- and it is a reasonable standard in the Fourth Amendment.

And so what you've raised to me -- and I'm not a lawyer and don't want to become one -- but what you've raised to me is, in terms of quoting the Fourth Amendment, is an issue of the Constitution.

The constitutional standard is reasonable. And we believe -- I am convinced that we're lawful, because what it is we're doing is reasonable.

MODERATOR: Thank you very much, General Hayden. And with that, this proceeding is over. Thank you.

HAYDEN: Thanks.

END

NOTES:
[????] - Indicates Speaker Unknown
[--] - Indicates could not make out what was being said [off mike] - Indicates could not make out what was being said.

LOAD-DATE: January 23, 2006

18

███████████████ (OGC) (FBI)

| From: | JUPINA, MICHELLE ANN (DO) (FBI) |
| Sent: | Friday, December 23, 2005 4:59 PM |
| Cc: | JUPINA, MICHELLE ANN (DO) (FBI) |
| Subject: | Message from EAD Bald |

**b6**
**b7C**

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 1/20/07 BY 65179 DMH/PLB/SAc

<u>SENSITIVE BUT UNCLASSIFIED</u>
<u>RECORD TBD</u>

The following is a message from EAD Gary M. Bald:

You probably have seen or heard recent media reports, including the New York Times article, "Bush Lets U.S. Spy on Callers Without Courts," concerning an NSA surveillance program. Although the President publicly acknowledged the existence of the program on December 17, 2005, neither he nor any other authorized classifying official has declassified any aspect of this program.

In the event you receive any inquiries on this matter, please 1) remind the inquirer that it is a violation of federal law to disclose classified information, and that the laws and policies governing the protection and non-disclosure of nation security information, such as this program, remain in full force and effect; and 2) advise Timothy Bereznay, Deputy Assistant Director, Counterintelligence Division, at 202-324-████. Thank you for your commitment to maintaining our national security.

**b2**

<u>SENSITIVE BUT UNCLASSIFIED</u>

1

FBI 1135

b6
OGC) (FBI) b7C

From: b6 DO) (OGA)
Sent: b7C Tuesday, January 31, 2006 7:08 PM
To: CAPRONI, VALERIE E. (OGC) (FBI)
Subject: Excerpt from 12/19/05 briefing/Q&A

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 11/20/07 BY 65179 DM#/RB/STC

UNCLASSIFIED
NON-RECORD

Q: will you release ....the declassified versions of the legal rationale for this from OLC? And if not, why not? To assure the American public that this was done w/ the legal authority that you state.

A: (AG): We're engaged now in a process of educating the American people, again, and educating Congress. We'll make the appropriate evaluation at the appropriate time as to whether or not additional information needs to be provided to the Congress or the American people.

Q: You declassified OLC opinions before, after the torture — why not do that here to show, yes, we went through a process?

A: (AG): I'm not confirming the existence of opinions or the non-existence of opinions I've offered up today our legal analysis of the authorities of the President.

UNCLASSIFIED

(OGC) (FBI)   b6
b7C

From:           CAPRONI, VALERIE E. (OGC) (FBI)
Sent:           Wednesday, February 01, 2006 8:12 AM
To:             [redacted] (DO) (OGA)
Subject:        RE: Excerpt from 12/19/05 briefing/Q&A

UNCLASSIFIED
NON-RECORD

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 11/20/07  BY b5179 DMH/PRB/SAC

Cooler (or something) heads have prevailed. This isn't a problem.

-----Original Message-----
From:           [redacted] (DO) (OGA)
Sent:           Tuesday, January 31, 2006 7:08 PM
To:             CAPRONI, VALERIE E. (OGC) (FBI)
Subject:        Excerpt from 12/19/05 briefing/Q&A

UNCLASSIFIED
NON-RECORD

Q:  will you release ....the declassified versions of the legal rationale for this from OLC? And if not, why not? To assure the American public that this was done w/ the legal authority that you state.

A:  (AG): We're engaged now in a process of educating the American people, again, and educating Congress. We'll make the appropriate evaluation at the appropriate time as to whether or not additional information needs to be provided to the Congress or the American people.

Q:  You declassified OLC opinions before, after the torture — why not do that here to show, yes, we went through a process?

A:  (AG): I'm not confirming the existence of opinions or the non-existence of opinions I've offered up today our legal analysis of the authorities of the President.

UNCLASSIFIED

UNCLASSIFIED

FBI-2885