_____OGC) (FBI)

From: _____
Sent: _____  **bb**
To: _____  **b7c**
Subject: _____

BOWMAN, MARION E. (OI) (FBI)
Tuesday, February 07, 2006 8:37 AM
CAPRONI, VALERIE E. (OGC) (FBI)
FYI!

UNCLASSIFIED
NON-RECORD

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 4/20/07 BY 65179 DMH/PCB/SAC

I believe you know Bryan



NSAsurveillanceME
MO.pdf (1 MB)...

UNCLASSIFIED

FBI-296

OGC) (FBI)

| | |
|---|---|
| From: | BOWMAN, MARION E. (OI) (FBI) |
| Sent: | Tuesday, February 07, 2006 9:26 AM |
| To: | CAPRONI, VALERIE E. (OGC) (FBI) |
| Subject: | RE: FYI |

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 4/26/07 BY

UNCLASSIFIED
NON-RECORD

He sides with the Administration, but not from a "this is urgent, FISA is too slow" perspective. He really focuses on the Constitutional argument that there are residual Presidential powers that have been neither negated nor regulated. Interestingly, he has a quote of Walter Dellinger in there that I was unaware of - a quote that would tend to support the Presidential power argument

-----Original Message-----
| From: | CAPRONI, VALERIE E. (OGC) (FBI) |
| Sent: | Tuesday, February 07, 2006 9:24 AM |
| To: | BOWMAN, MARION E. (OI) (FBI) |
| Subject: | RE: FYI |

UNCLASSIFIED
NON-RECORD

I haven't read the letter yet – too many footnotes – but what side does he come down on?

-----Original Message-----
| From: | BOWMAN, MARION E. (OI) (FBI) |
| Sent: | Tuesday, February 07, 2006 9:23 AM |
| To: | CAPRONI, VALERIE E. (OGC) (FBI) |
| Subject: | RE: FYI |

UNCLASSIFIED
NON-RECORD

He was Bellinger's deputy for a couple of years. He had been CIA (we worked with him a lot several years ago), then went into private practice and returned to NSC for 2, maybe 3, years.

-----Original Message-----
| From: | CAPRONI, VALERIE E. (OGC) (FBI) |
| Sent: | Tuesday, February 07, 2006 9:19 AM |
| To: | BOWMAN, MARION E. (OI) (FBI) |
| Subject: | RE: FYI |

UNCLASSIFIED
NON-RECORD

The name is familiar – why do I know him?

-----Original Message-----
| From: | BOWMAN, MARION E. (OI) (FBI) |
| Sent: | Tuesday, February 07, 2006 8:37 AM |
| To: | CAPRONI, VALERIE E. (OGC) (FBI) |
| Subject: | FYI |

UNCLASSIFIED
NON-RECORD

1

I believe you know Bryan

<< File: NSAsurveillanceMEMO.pdf >>

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

MORGAN & CUNNINGHAM LLC

ATTORNEYS AT LAW

TWO TAMARAC CENTER, SUITE 425

7535 EAST HAMPDEN AVENUE

DENVER, COLORADO 80231

CLAROLD F. MORGAN
C. FORREST MORGAN, III.
H. BRYAN CUNNINGHAM

TELEPHONE (303) 743-0003
FACSIMILE (303) 743-0003

February 3, 2006

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 11/20/07 BY 65179DMH/PCB/JAC

The Hon. Arlen Specter
Chairman
Judiciary Committee
United States Senate
Washington, D.C. 20510

The Hon. Patrick Leahy
Ranking Minority Member
Judiciary Committee
United States Senate
Washington, D.C. 20510

Re:   Additional Constitutional Authorities Relevant to NSA Electronic Surveillance
Activities of International Terrorist Communications

Dear Chairman Specter and Senator Leahy:

I am a former career national security lawyer and Central Intelligence Agency officer, now in private practice, after serving more than six years in the CIA and Department of Justice under President Clinton and, from May 2002 – August 2004, as Deputy Legal Adviser to President George W. Bush's National Security Council ("NSC").[1] I write to provide additional perspective, and to identify several important constitutional principles not yet widely discussed in published legal analyses, with regard to the recently disclosed National Security Agency ("NSA") program to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations (the "NSA Program").[2] Because of the importance of these constitutional principles, I urge Congress to consider the analysis, and legal authorities identified, in the remainder of this letter as you debate this critical issue.

_Executive Summary_

Even assuming, though we do not yet know all the facts, that at least some aspects of the NSA Program were not consistent with the procedural strictures laid down by Congress in FISA, published legal analyses to date by the Commentators (as defined in endnote 8) are fatally flawed, as follows:

- Two centuries of Supreme Court and other legal precedent strongly suggests that the National Security Agency program to intercept international communications of foreign terrorists is consistent with the Constitution and, therefore, lawful;

- The Commentators generally argue that that the President is _completely foreclosed_ from exercising the "core" of his "plenary" constitutional foreign affairs authority – that is, the collection of foreign intelligence – except when complying with each and every provision of FISA, even if, as applied to the narrow facts and circumstances of the NSA



Program, FISA itself violates the Constitution;

- The Commentators' arguments fail because they:

  o ignore completely two entire lines of well-established Supreme Court cases relating to: (a) the President's "core," "plenary" constitutional authority over foreign intelligence operations; and (b) the separation-of-powers doctrine; and

  o overly rely on – and misinterpret – a single case relating to primarily "domestic" actions by a President, in which foreign intelligence operations like those at issue here were not implicated.

- The Commentators' fundamental mistake is the assertion that, if the NSA Program falls into "Zone 3" (where the President's authority is at its "lowest ebb," *though not extinguished*) of Supreme Court Justice Jackson's famous 1952 analysis in *Youngstown Sheet & Tube*, the constitutional analysis ends there and the President is compelled to follow every dictate of FISA;

- Taken to its logical extreme, the Critics' position would fundamentally alter the system of separation of powers and checks and balances created by our Constitution, transforming our governmental system into one in which Congress alone reigns supreme in virtually all spheres of governmental action;

- The better constitutional analysis in areas of shared Executive and Congressional authority, and one more consistent with recent Supreme Court separation-of-powers opinions, and with *Youngstown* itself, balances the relative constitutional authorities of the President and Congress. Even where, in Justice Jackson's terminology, the President's authority is at its "lowest ebb," it obviously is not extinguished, as recognized by the very next words of Justice Jackson's opinion, conceding that the President still can rely "upon his own constitutional powers minus any constitutional powers of Congress;"

- Under this more appropriate analysis, the President's powers over the conduct of foreign intelligence operations appear significantly stronger than those of Congress, since Supreme Court decisions place control of foreign intelligence operations at the "core" of the President's "plenary" foreign affairs powers;

- The conduct of foreign intelligence operations, such as the NSA Program, is a "constitutional function" of the President, and within the President's "central prerogatives," which Congress may not constitutionally impair. Therefore, if FISA is interpreted to prohibit the NSA program, FISA itself violates our Constitution (as narrowly applied to the NSA program);

2

- The Commentators' assertion that the President, in authorizing the NSA Program, engaged in criminal behavior falls under the weight of legal advice, based on Supreme Court precedent, propounded by the Clinton Administration as well as other administrations of both political parties, that the President has the authority, if not the duty, to decline to follow portions of statutes reasonably believed to be unconstitutional and, further, that the President may do so without public announcement, except in the time, manner, and form he chooses; and

- Whether FISA is unconstitutional as applied to the NSA Program will turn on facts and circumstances we do not yet know. Assuming the facts as I have in this letter, however, the President could reasonably have concluded that FISA, as applied, would impermissibly impede his ability to carry out his constitutional responsibility to collect foreign intelligence and protect the Nation from attack and, therefore, the President was constitutionally entitled to decline to adhere to FISA's requirements in the narrow circumstances of the NSA Program. In so doing, the President would have, in every sense, acted lawfully and constitutionally.

Detailed discussion, and United States Supreme Court and other legal precedent, supporting the points made above, are contained in Sections II through V, below.

I.   *Introduction*

This analysis sets forth certain Constitutional arguments supported by Supreme Court and other federal court precedent, historical practice, and my first-hand understanding of the interpretation of national security law over at least two administration, that of President Clinton and of President George W. Bush. In order to focus on these important constitutional issues, this letter does not address certain other arguments, including those based on the September 18, 2001 Authorization to Use Military Force ("AUMF"), or on Congress' intent in passing the Foreign Intelligence Surveillance Act of 1978 ("FISA").

Before proceeding, it must be acknowledged that, in the debate over the constitutional separation of powers between the Executive and Congress -- a debate that has raged from the founding of the Nation -- there is a "poverty of really useful and unambiguous authority applicable to concrete problems of executive power as they actually present themselves" as Justice Jackson famously put it.[3] Further, because the full details of the NSA Program are unknown -- and may never be known outside of classified hearings given the highly sensitive nature of the methods likely employed -- I make certain assumptions for purposes of this letter about the facts, based on publicly reported descriptions as of February 3, 2006, as set out below:

For purposes of this letter, then, I assume the following facts:

- Following the single deadliest attack against civilians on US soil by a foreign enemy (al Qaeda) in our history, facilitated, at least in part, by electronic communications between al Qaeda operatives physically located within the United States and those overseas, the

President authorized the NSA to intercept international communications of individuals where there is a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, without first obtaining an order under FISA;

- The NSA Program targets, for interception of content, communications in which at least one party to the communication is reasonably believed to be physically located overseas, but at least some of this activity falls within FISA's definition of "electronic surveillance;"[4]

- The President reasonably considered the NSA Program an important component of what he had determined, and announced — with Congressional support in the form of an authorizing resolution — to be a global military campaign against al Qaeda and related terrorist organizations; and

- The President, advised by appropriate intelligence and national security law experts, reasonably concluded that the communications targeted by the NSA Program could not be collected in a fashion sufficiently timely to carry out, under the bureaucratically demanding strictures of FISA, his constitutional responsibilities to collect foreign intelligence and protect the Nation from attack.

II.    *The Critical Gap in Published Constitutional Analyses of the NSA Program*

Most of the published legal analyses to date examining the constitutionality of the President's authorization of the NSA Program begin and end roughly as follows:[5]

- Congress has certain enumerated constitutional authorities related to electronic surveillance within the United States, and it passed FISA pursuant to those authorities;

- FISA "comprehensively regulates" electronic surveillance for foreign intelligence purposes within the United States; Congress intended FISA to be the "exclusive means" for such electronic surveillance; and FISA criminalizes all other electronic surveillance (with the exception of Title III surveillance for criminal investigations);

- Whatever the President's inherent constitutional authority to conduct warrantless electronic surveillance for foreign intelligence purposes (which numerous federal court decisions have upheld, and even most of the Commentators concede, the President possessed prior to FISA), FISA was intended to fully cabin that authority;

*Therefore* (and here is where these analyses go fatally off course):

- The Commentators asserting the illegality of the NSA Program conclude that, where Congress has any constitutional role whatsoever in a particular area, and intends to make its mandated procedures "exclusive," the President is *completely foreclosed* from exercising the

"core"[6] of his "plenary"[7] constitutional foreign affairs authority -- that is, the collection of foreign intelligence -- except when complying with each and every provision of FISA.

- These Commentators appear to contend that this is so even if FISA, as applied to the narrow facts and circumstances of the NSA Program, is, itself, unconstitutional. That is, at least some of the Commentators seem to they believe the President commits a crime by declining to execute a law that, itself, violates the United States Constitution.[8]

Such conclusions are unwarranted as a matter of law, unwise and unworkable as a matter of practice, and, most importantly, are themselves constitutionally suspect. Although, of course, "no one is above the law," the United States Constitution is the highest law in our Nation, and statutes inconsistent with the Constitution cannot stand or be enforced by courts.[9]

As Walter Dellinger (today a signatory of the *Cole-Dellinger Letter*,[10] which opines that the NSA Program is illegal), President Clinton's then-Assistant Attorney General for the Office of Legal Counsel (OLC),[11] advised the Clinton Administration in 1994:

> [W]here the President believes that an enactment unconstitutionally limits his powers, he has the authority to . . . *decline to abide by it*, unless he is convinced that the [Supreme] Court would disagree with his assessment.[12]

### A.   The Commentators' Misreading and Attempted Overextension of Youngstown

In the 1952 case of *Youngstown Sheet & Tube v. Sawyer*, Supreme Court Justice Robert Jackson's concurring opinion famously articulated a three-part analysis for assessing the constitutionality of a President's actions.[14] In so-called "Zone 1," where a President acts pursuant to authorization by Congress (express or implied), the President is in his most powerful constitutional position, because he exercises not only his own constitutional powers, but "all that Congress can delegate."[15] In "Zone 2," where Congress has not spoken in a particular area, the President must rely upon his constitutional powers alone.[16] In Zone 3, where Congress, by statute, has attempted to foreclose or regulate the President's actions, his power is at its "lowest ebb," because he can "rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."[17]

The Commentators assert that the NSA Program must fall into Zone 3, based on their reading of FISA's exclusivity provision, and their rejection of the Administration's argument that the AUMF is a statutory augmentation of the President's own constitutional powers in the area of foreign intelligence electronic surveillance. The Administration argues that passage of the AUMF places the NSA Program into Justice Jackson's Zone 1 which, if correct, would eliminate the need for the constitutional analysis put forward in this letter, for the NSA Program then would be clearly constitutional without needing to rely on the President's inherent constitutional authority. For purposes of this letter, while acknowledging the legitimacy of the Administration's position, I assume that the NSA Program falls into Justice Jackson's Zone 3.

As noted above, the Commentators assert that, if the NSA Program falls into Zone 3, the constitutional analysis ends, and the President's authorization of the NSA Program must be illegal. Beyond one sentence in *Youngstown* itself, the Commentators cite virtually no judicial authority for this position, however, and my research has identified none.

To the contrary, the Commentators' position is undermined by:

1. Justice Jackson's *Youngstown* opinion itself;
2. The vast difference between the facts and circumstances at issue in *Youngstown*, and those in the current debate;
3. Supreme Court jurisprudence establishing the primary position of the President in foreign affairs and, particularly, in foreign intelligence operations, such as the NSA Program;
4. Decades of Supreme Court and other federal court decisions, as well as Executive Branch legal opinions under both political parties, concerning the constitutional separation of powers between Congress and the Executive; and
5. Longstanding legal precedent establishing a President's authority, if not duty, to decline to execute statutory provisions the President reasonably believes violate our Constitution.

### 1. Misreading of Justice Jackson's Opinion

Some of the Commentators' analysis simply end their analysis with a reference to the statement by Justice Jackson that the President's power is at its "lowest ebb" in Zone 3, moving on to assert the illegality of the NSA Program. Those that cite any legal authority for this position appear to rely solely on Justice Jackson's statement that "[c]ourts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject."[18]

I have been unable to find a single Supreme Court case in the more than 50 years since *Youngstown* in which this principle asserted by the Commentators has been used to strike down any President's decision to decline to abide by a part of a statute the President believed violated our Constitution. Furthermore, a moment's reflection on this proposition demonstrates that it could not possibly have been intended to carry the decisional weight the Commentators place on it.

To cite just a few examples of actions that, if the Commentators' arguments were correct, may well have been lawful exercises of Congress' power:

- Congress could, by virtue of its power to ratify treaties, control negations with foreign governments;[19]

- Congress could, by virtue of it's authority to declare war, prevent a President from using military force to respond to an overseas attack on Americans, a power which Congress itself appears to have conceded it does not have;[20]

- Congress could, by virtue of its authority to make rules for the Army and Navy, completely foreclose the President, as Commander in Chief, from holding courts martial for military personnel;[21] or

- Congress could, by virtue of its power to make and support armies and make all laws necessary and proper to that end, prevent the President from placing U.S. troops under United Nations Command (viewed as an unconstitutional act by Congress, at least in the opinion of Clinton Administration Assistant Attorney General Dellinger).[22]

In each of these cases, however, as demonstrated by the legal authorities cited in the endnotes, our Courts and/or Executive Branch legal opinions (under both political parties) have rejected such exercises of Congress' power as unconstitutional.

Put another way, the Commentators' position, taken to its logical extreme, would fundamentally alter the system of separation of powers and checks and balances created by our Constitution, transforming our governmental system into one in which Congress alone reigns supreme in virtually all spheres of governmental action. This is likely one reason why, as discussed in Section IV.B., OLC opinions under Presidents of both political parties, are fundamentally incompatible with the Commentators' reading of Justice Jackson's opinion.

Clearly, as the Commentators point out, Congress has multiple constitutionally enumerated powers directly related to the President's Commander-in-Chief power. If the single *Youngstown* sentence on which the Commentators rely were interpreted as the Commentators urge, Mr. Dellinger's advice, to President Clinton, *supra* note 22, as well as many other legal opinions provided to Presidents of both political parties, would be fatally flawed.

The better constitutional analysis in areas of shared Executive and Congressional authority is a more nuanced, balancing approach, taking into account the relative constitutional authorities of the President and Congress.[23] Even where, in Justice Jackson's terminology, the President's authority is at its "lowest ebb," it obviously is not *extinguished*, as recognized by the very next words of Justice Jackson's opinion, which concede that a President may still rely "upon his own constitutional powers minus any constitutional powers of Congress over the matter."[24] This statement would make no sense unless Justice Jackson contemplated circumstances in which powers at this "lowest ebb" still were enough to sustain a President's action (or, put conversely, invalidate Congress' action as unconstitutional).

    2.    *The Commentators Apply Justice Jackson's Concurrence Beyond Its Reach*[25]

Courts and commentators have long recognized that separation-of-powers conflicts between Congress and the President, such as that underway today with regard to the NSA Program, must be analyzed quite differently in foreign affairs/national security cases than in cases involving principally domestic issues.[26] In primarily foreign affairs/national security cases, much greater

deference must be given to the President's authority, and expressions of Congressional will are treated as far less dispositive, than in primarily domestic cases.[27]

Even a cursory analysis of *Youngstown* shows that, although the Executive/Congressional conflict at issue in that case unfolded against the backdrop of the Korean War, the issues at stake were far more "domestic" in nature than those involved in the NSA Program. *Youngstown* involved President Truman ordering the seizure and control by the U.S. Government of U.S. steel mills due to the failure of the steel industry and unions to reach a collective bargaining agreement.[28]    In striking down President Truman's seizure by Executive Order, the majority in *Youngstown* recited the following powers of Congress:

> It can authorize the taking of private property for public use. It can make laws regulating the relationships between employers and employees, prescribing rules designed to settle labor disputes, and fixing wages and working conditions in certain fields of our economy.[29]

The *Youngstown* majority also relies more generally upon Congress' authority to "make all laws which shall be necessary and proper,"[30] but, tellingly, does *not* rely on Congress' enumerated powers to raise and support an Army or to provide and maintain a Navy. Although Justice Jackson's concurring opinion (one of five in the case) discusses these powers, he couples them with Congress' exclusive power over the "raising of revenues and their appropriation."[31]

Moreover, Justice Jackson himself, noting that Congress could directly "take over war supply," then asked the rhetorical question: "[I]f Congress sees fit to rely on free private enterprise collectively bargaining with free labor for support and maintenance of our armed forces can the Executive . . . seize the facility for operation upon Government-imposed terms?"[32] Justice Jackson, then, saw the *Youngstown* steel seizure as an activity encompassing powers over our domestic economy and labor relations overwhelmingly vested by the Constitution and court decisions in the Congress, albeit with some limited authority in related areas committed to the President.

As discussed in detail in Section III, the *Youngstown* situation stands in stark contrast to the President's foreign intelligence/foreign affairs power at issue in the context of the NSA Program. The Commentators' failure to recognize this fundamental difference between *Youngstown* and the NSA Program weakens, to the point of collapse, the force of their constitutional analysis. Whatever the precise constitutional contours of Congressional and Executive power where regulation of our domestic economy intersects with the supply of our armed forces, even during active hostilities, the vastly greater constitutional power of the President in the field of foreign affairs, national security and, particularly, the conduct of foreign intelligence operations, as discussed below, is clear. Moreover, it is decisive, even assuming, *arguendo*, that the words of FISA place the President at the "lowest ebb" of those powers in this current separation-of-powers conflict with the Congress.

III.   *The President's Plenary Foreign Affairs Power and Foreign Intelligence Operations*

A.   *Primary Responsibility for Protecting National Security and Conducting Foreign Intelligence Operations Rests With the President Due, in Significant Measure, to His "Plenary" Foreign Affairs Authority*

Both the Administration and the Commentators discuss the President's authority to authorize the NSA Program principally in the context of the power committed to the President under Article II, Section 2, of the Constitution to be "the Commander in Chief of the Army and Navy of the United States." This focus is understandable, given the apparent recognition by both sides of the debate that the NSA Program is part of the ongoing global military campaign against terror, announced by the President in response to al Qaeda's attacks on our homeland, and recognized by Congress in the AUMF. This focus is incomplete, however, because it fails to give due weight to a critical series of Supreme Court decisions and Executive Branch legal opinions analyzing the power to control foreign intelligence operations such as the NSA Program. This power falls principally under the President's constitutional *foreign affairs* authority.[33]

The United States Constitution, in its text, places the duty on the President – and *only* the President – to "preserve, protect, and defend the Constitution."[34] At least since 1898, Supreme Court authority, and Executive Branch opinions under both political parties relying on such authority, has recognized that the President has the first, strongest, and most direct authority and responsibility for the protection of our national security, and that this authority and responsibility flows, at least in significant part, from the President's "plenary" authority over the conduct of our foreign affairs.[35]

> The preservation of our territorial integrity and the protection of our foreign interests is intrusted, in the first instance, to the President. The Constitution, established by the people of the United States as the fundamental law of the land, has conferred upon the President the executive power; has made him the Commander in Chief of the Army and Navy; has authorized him, by and with the consent of the Senate, to make treaties, and to appoint ambassadors, public ministers, and consuls; and has made it his duty to take care that the laws be faithfully executed. In the protection of these fundamental rights, which are based upon the Constitution and grow out of the jurisdiction of this nation over its own territory and its international rights and obligations as a distinct sovereignty, the President is not limited to the enforcement of specific acts of Congress. He takes a solemn oath to faithfully execute the office of President, and to preserve, protect, and defend the Constitution of the United States. To do this he must preserve, protect, and defend those fundamental rights which flow from the Constitution itself and belong to the sovereignty it created.[36]

Supreme Court decisions over many decades strongly support this view, including, importantly, a number of cases decided *after Youngstown*. For example, in *Department of the Navy v. Egan*, Justice Harry Blackmun, writing for the majority, reiterated that the "Court . . . has recognized 'the generally accepted view that foreign policy was the province and responsibility of the

Executive.'"[37]. The same Justice Robert Jackson who wrote the 1952 *Youngstown* concurrence in the primarily domestic context, several years earlier, in *Johnson v. Eisentrager*, wrote for the majority of the Supreme Court that the issues in that case involved "a challenge to [the] conduct of diplomatic and foreign affairs, *for which the President is exclusively responsible*."[38]

Perhaps most famously, the Supreme Court forcefully affirmed, in its 1936 decision in *U.S. v. Curtiss-Wright Export*, the:

> *delicate, plenary and exclusive* power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution.[39]

Not only has the Supreme Court never reversed its holding in *Curtiss-Wright*, but a Westlaw search indicates it has been cited well over 150 times, including, as indicated above and below, in numerous cases decided well *after Youngstown*. As noted in Section III.B., Justice O'Connor specifically relied on *Curtiss-Wright* in 1989 to support her view that the President's foreign intelligence authority lies at the "core" of the "plenary" Presidential power over foreign affairs.

Moreover, the *Curtiss-Wright* line of precedent is consistent with a proper construction of Justice Jackson's *Youngstown* concurrence outlined herein, i.e., one that recognizes, as argued herein, that being in Zone 3 does not eviscerate the constitutional authority of the President. Rather, the outcome then, depends, in significant part, upon the relative constitutional authorities of the President and Congress in a particular area.

> B.    Foreign Intelligence Operations Lie at the "Core" of the President's Plenary Powers

Our courts, including the Supreme Court, have clearly and repeatedly linked the President's inherent foreign affairs power and the power to protect national security to his authority over foreign intelligence collection operations, and, specifically, electronic surveillance for foreign intelligence purposes.

For example, as noted above, in reaffirming that the "authority to protect [classified] information falls on the President", the Supreme Court in 1988 relied on its longstanding recognition of "'the generally accepted view that foreign policy was the province and responsibility of the Executive'").[40] One particularly relevant federal appeals court decision is *United States v. Brown*, upholding the President's inherent constitutional power to authorize warrantless wiretaps for foreign intelligence purposes. There, the Court of Appeals for the Fifth Circuit, held:

> [B]ecause of the President's constitutional duty to act for the United States in the field of foreign relations, and his inherent power to protect national security in the context of foreign affairs, we reaffirm [that] the President may constitutionally authorize warrantless

10.

wiretaps for the purpose of gathering foreign intelligence. *Restrictions upon the President's power which are appropriate in cases of domestic security become artificial in the context of the international sphere.* Our holding . . . is buttressed by a thread which runs through the Federalist Papers: that the President must take care to safeguard the nation from possible foreign encroachment, whether in its existence as a nation or in its intercourse with other nations. See e.g., The Federalist No. 64, at 434-36 (Jay); The Federalist No. 70, at 471 (Hamilton); The Federalist No. 74 at 500 (Hamilton) (J. Cooke ed. 1961).[41]

In addition to Supreme Court and other federal court precedent, and Executive Branch legal opinions under administrations of both political parties, significant work by legal scholars, including the writings of a former Principal Deputy Solicitor General to President Clinton, also support this "Executive Primacy" view of the foreign affairs power.[42]

As firmly established is the President's plenary constitutional position in foreign affairs generally, however, it is even stronger in the conduct of foreign intelligence operations.

In a 1988 decision upholding the authority of the President's senior intelligence official to terminate the authority of a CIA employee on sexual preference grounds, Justice O'Connor stated:

> The functions performed by the Central Intelligence Agency and the Director of Central Intelligence lie *at the core of* "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations.[43]

Thus, even conceding, for the sake of argument, that the NSA Program falls within Justice Jackson's Zone 3, it is beyond serious contention, based on the cases cited herein, as well as numerous other federal court decisions, that the President's authority over foreign intelligence operations lies at or near the zenith of the President's constitutional powers.[44]

IV. *The Commentators Ignore Fundamental Principles of Constitutional Separation-of-Powers Analysis*

   A. *Separation of Powers as a Bedrock Constitutional Principle*[45]

In concluding that the combination of a Congressional declaration of exclusivity and the existence of any Congressional power in an area ends the constitutional analysis, the Commentators completely ignore fundamental principles, reaffirmed by the Supreme Court well after *Youngstown,* for deciding the extent to which Congress can tie the President's hands in an area of his constitutional responsibility. A proper separation-of-powers analysis must be a critical component in determining whether the President's authorization of the NSA Program is constitutional and, therefore, lawful, notwithstanding FISA.

11

Despite the implication in the Commentators' writings to the contrary, not every statute passed by Congress can, merely by using words of "exclusivity," completely extinguish the constitutional prerogatives of another co-equal branch of our government. If Congress could do so, we would not need a judicial branch to decide constitutionality/separation-of-powers issues: Congress' word, whether constitutional or not, would simply be final in all cases.

As attractive as that may be to some, it simply is not the constitutional system our framers designed. Rather, although the Commentators' fail to discuss this central tenet of our constitutional system, the actions of all three branches of our government are limited by separation-of-powers principles that have structured our constitutional arrangement since the founding.[46]

As the Supreme Court reminded us in 1996: "Even before the birth of this country, separation of powers was known to be a defense against tyranny . . . [and] it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another. . . ."[47] Similarly, in *William Jefferson Clinton v. Paula Corbin Jones*, a seminal recent separation-of-powers case, the Supreme Court held:

> The doctrine of separation of powers is concerned with the allocation of official power among the three coequal branches of our Government . . . . Thus, for example, the Congress may not exercise . . . the executive power to manage an airport."[48]

In reaffirming this fundamental constitutional principle, and the "unique position in the constitutional scheme" occupied by the President, it is no accident that the Supreme Court — some 45 years after *Youngstown* — chose to use the President's foreign affairs authorities as an example of where separation-of-powers, in some cases, must trump authorities of another co-equal branch of government. The Court thus reminded us that the conduct of foreign affairs is "a realm in which the Court has recognized that [i]t would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."[49] Interestingly, the original source of this 1997 Supreme Court statement was a previous Supreme Court case that made note of the President's core authority over foreign intelligence activities.[50]

The Supreme Court has provided some guidance for the admittedly difficult task of determining whether particular attempts by one of our three co-equal branches of government to tie the hands of another branch are unconstitutional and, therefore, without legal effect. As recently as 1997, the Supreme Court reaffirmed that one branch of government may not, consistent with our Constitution, "impair another in the performance of its constitutional duties."[51] In *Clinton v. Jones*, the Supreme Court unanimously rejected President Clinton's claim to temporary immunity from any civil legal proceedings against him, which claim was based in significant part on President Clinton's separation-of-powers assertion that his powers were "so vast and important" as to "place limits on the authority of the Federal Judiciary."[52]

12

Although the Court rejected President Clinton's claim of immunity, it unanimously reaffirmed the important place of separation-of-powers analysis in our constitutional system of government. Relying on decades of its own precedent, the Supreme Court's separation-of-powers analysis appeared to turn on the "possibility that the [actions of one co-equal branch of government, in that case, the Federal Judiciary] will curtail the scope of the official powers of the Executive Branch."[53] Put another way, the Supreme Court's test for whether one branch of government has violated our constitutional principle of separation of powers and, therefore, acted unconstitutionally, is whether the action rises "to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions."[54]

As discussed in Section III.B, the conduct of foreign intelligence operations is a "constitutional function" of the President, and is within one of the President's "central prerogatives," which Congress may not constitutionally impair. Recognition of this may have led the Congress that passed FISA to state, even as it was passing the law, that:

> The conferees agree that the establishment by this act of exclusive means by which the President may conduct electronic surveillance *does not foreclose a different decision by the Supreme Court.* The intent of the conferees is to apply the standard set forth in Justice Jackson's concurring opinion in the [*Youngstown*] case."[55]

Surprisingly, the Commentators generally either ignore, or pay only brief lip service to, this extraordinary admission accompanying the original passage of FISA. This statement, by the Congress that passed FISA, is significant for several reasons. First, it acknowledges that Congress itself had some doubt about the constitutionality of FISA's attempt to completely control the President's authority to conduct electronic surveillance for foreign intelligence purposes. Second, it suggests that Congress understood that, even within Justice Jackson's Zone 3, there are limits to the degree to which Congress may constitutionally restrict the President in the area of foreign intelligence collection.

Finally, the statement by the Congress enacting FISA indicates that Congress specifically contemplated that the degree to which FISA might constitutionally tie the President's hands could one day reach the Supreme Court. This makes sense if, but only if, Congress contemplated that then-President Carter, or a future President, might be required to act outside the FISA statute, exercising the very inherent authority that Congress was attempting to limit.

As discussed above, then, the weight of Supreme Court authority, as well as more than 200 years of Executive practice, provide ample support for the view that, if construed to foreclose the type of NSA foreign intelligence collection assumed herein, FISA is unconstitutional as applied to the NSA Program to the extent it impermissibly impedes the President's ability to carry out his constitutional responsibilities to collect foreign intelligence and protect our Nation from attack.

Just as the *Youngstown* analysis does not end the inquiry, however, neither does a conclusion of unconstitutionality. The question then becomes, what is a President permitted or compelled to do once reasonably reaching such a conclusion?

B.    *The President's Constitutional Authority to Decline to Follow Unconstitutional Statutes*

The Commentators charge that the President, in authorizing the NSA Program, acted illegally because, Congress having spoken definitively through FISA, the President had no lawful option except to follow the statute to the letter, even if FISA itself was in violation of our Constitution. This conclusion, while perhaps politically appealing in the short term, defies decades of Supreme Court and other legal precedent, as well as Executive Branch legal opinions by Administrations of both political parties, holding that Presidents have the constitutional prerogative – if not the constitutional duty – to decline to follow provisions of statutes they reasonably believe to be unconstitutional.

As noted above, one of the most thoughtful and persuasive enunciations of this conclusion was drafted, interestingly enough, by one of the signatories of the aforementioned Cole-Dellinger letter, sharply critical of the President's authorization of the NSA Program. Then-Assistant Attorney General Walter Dellinger advised President Clinton's counsel of the "general proposition that I believe to be uncontroversial: there are circumstances in which the President may appropriately decline to enforce a statute that he views as unconstitutional."[56]

Dellinger cited "significant judicial approval" of this proposition, including:

the Court's decision in *Myers v. United States*, 272 U.S. 52 (1926). There the Court sustained the President's view that the statute at issue was unconstitutional without any member of the Court suggesting that the President had acted improperly in refusing to abide by the statute. More recently, in *Freytag v. Commissioner*, 501 U.S. 868 (1991), all four of the Justices who addressed the issue agreed that the President has "the power to veto encroaching laws . . . or even to disregard them when they are unconstitutional." *Id.* at 906 (Scalia, J., concurring); *see also Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (recognizing existence of President's authority to act contrary to a statutory command).[57]

Dellinger further opined that:

consistent and substantial executive practice also confirms this general proposition. Opinions dating to at least 1860 assert the President's authority to decline to effectuate enactments that the President views as unconstitutional. *See, e.g., Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469-70 (1860) (asserting that the President need not enforce a statute purporting to appoint an officer)."[58]

After wisely cautioning that the President should decline to enforce a statute he or she considers unconstitutional only where he or she believes the Supreme Court would agree, and then only in rare cases, Dellinger advised President Clinton, through his counsel, as follows, at least

14

implicitly suggesting that the President has a constitutional duty to decline to execute unconstitutional statutory provisions:

> The President has *enhanced responsibility to resist unconstitutional provisions that encroach upon the constitutional powers of the Presidency.* Where the President believes that an enactment unconstitutionally limits his powers, he has the authority to defend his office and decline to abide by it, unless he is convinced that the Court would disagree with his assessment. . . . If the President does not challenge such provisions (*i.e.,* by refusing to execute them), there often will be no occasion for judicial consideration of their constitutionality; a policy of consistent Presidential enforcement of statutes limiting his power thus would deny the Supreme Court the opportunity to review the limitations and thereby would allow for unconstitutional restrictions on the President's authority.[59]

Finally, consistent with the view of Presidential authority in foreign and military affairs discussed in prior sections of this letter, Dellinger advised that a President's responsibility to decline to execute unconstitutional statutory provisions is:

> usually true, for example, of provisions limiting the President's authority as Commander in Chief. Where it is not possible to construe such provisions constitutionally, the President has the authority to act on his understanding of the Constitution.[60]

Moreover, contrary to the assertion by some that the President acted criminally by failing either to seek legislative relief from, or publicly declare his belief in, the unconstitutionality of, FISA, as applied, then-Assistant Attorney General Dellinger advised President Clinton, through his counsel, he not only could decline to enforce an unconstitutional provision without any public statement whatsoever, but he could even do so with regard to a statute he himself signed into law. Because this advice is so relevant to the charges now leveled against the President, I quote Mr. Dellinger's 1994 advice to President Clinton's counsel at some length:

> The fact that a sitting President signed the statute in question does not change this analysis. The text of the Constitution offers no basis for distinguishing bills based on who signed them; there is no constitutional analogue to the principles of waiver and estoppel. Moreover, every President since Eisenhower has issued signing statements in which he stated that he would refuse to execute unconstitutional provisions. . . . As we noted in our memorandum on Presidential signing statements, the President "may properly *announce* to Congress and to the public that he will not enforce a provision of an enactment he is signing. If so, then a signing statement that challenges what the President determines to be an unconstitutional encroachment on his power, or that announces the President's unwillingness to enforce (or willingness to litigate) such a provision, can be a valid and reasonable exercise of Presidential authority." . . . . (*Of course, the President is not obligated to announce his reservations in a signing statement; he can convey his views in the time, manner, and form of his choosing.*) Finally, the Supreme Court recognized this practice in *INS v. Chadha,* . . . [stating]: *"it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds"* and then

15

cited the example of President Franklin Roosevelt's memorandum to Attorney General Jackson, in which he indicated his intention not to implement an unconstitutional provision in a statute that he had just signed. . . . These sources suggest that the President's signing of a bill does not affect his authority to decline to enforce constitutionally objectionable provisions thereof.[61]

Though the title of this opinion diplomatically describes the President's constitutional authority as one to "decline to execute" unconstitutional statutes, it is clear, from this and other OLC opinions, that the intent was to confirm the President's authority, in rare cases, to act in contravention of provisions reasonably believed unconstitutionally to intrude on the President's constitutional responsibilities and authorities.

To cite one particularly pertinent example that this constitutional authority empowers the President not only to refuse to execute a statute requiring some affirmative act on the President's part, but also to act inconsistently with a statutory requirement or prohibition, is a 2000 OLC opinion for the Clinton Administration, ironically concerning electronic surveillance exclusively regulated by Congress. That opinion advised that "extraordinary circumstances" could arise in which "the President's constitutional powers permit disclosure of [criminal wiretap] information to the intelligence community *notwithstanding the restrictions of Title III.*"[62] In other words, President Clinton's Administration was advised, correctly in my view, that the President could act *in direct contravention of a criminal statute*, because limiting "the access of the President and his aides to information critical to national security or foreign relations would be unconstitutional as applied in those circumstances."[63]

This OLC Opinion, prepared for President Clinton's Office of Intelligence Policy and Review by then-Assistant Attorney General Randolph D. Moss, advised that the President could disregard statutory restrictions on sharing criminal wiretap information with intelligence officers, notwithstanding that the statute at issue carried criminal penalties. OLC advised that:

> [I]n extraordinary circumstances electronic surveillance conducted pursuant to Title III may yield information of such importance to national security or foreign relations that the President's constitutional powers will permit disclosure of the information to the intelligence community notwithstanding the restrictions of Title III. . . . [T]he Constitution vests the President with responsibility over all matters within the executive branch that bear on national defense and foreign affairs, including, where necessary, *the collection and dissemination of national security information.* Because "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation," *Haig [v. Agee]*, 453 U.S. at 307 (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)), the President has a powerful claim, under the Constitution, to receive information critical to the national security or foreign relations and to authorize its disclosure to the intelligence community. Where the President's authority concerning national security or foreign relations is in tension with a statutory rather than a constitutional rule, the statute cannot displace the President's constitutional authority and should be read to be "*subject to an implied exception* in deference to such Presidential

powers." *Rainbow Navigation, Inc. v. Department of the Navy*, 783 F.2d 1072, 1078 (D.C. Cir. 1986) (Scalia, J.). *We believe that, if Title III limited the access of the President and his aides to information critical to national security or foreign relations, it would be unconstitutional as applied in those circumstances.*[64]

Of course, even if FISA, as applied, is unconstitutional and, therefore, the President has full constitutional authority to decline to execute FISA as such, the NSA Program still must comport with the reasonableness requirements of the Fourth Amendment. Whether it does will depend completely on the precise facts and circumstances of how the program actually is being executed, and we simply do know enough yet (and the public may never know enough) about the program to reach a definitive judgment on that question. Based on what has been said publicly, however, it appears likely that the Supreme Court would find the NSA Program "reasonable," in light of: (a) the magnitude of the threat to our Nation, and the nature of the targets of the NSA Program; (b) the use of "minimization" procedures," and (c) initial internal review by multiple legal officials, along with regular legal — and, apparently, Presidential — review of the program.

V.    *Application of These Principles to the Assumed Facts of NSA Program.*

I do not assert in this letter that FISA is unconstitutional in all, or even most, respects. Whether or not it is unconstitutional *as applied* to the NSA Program also will turn on facts and circumstances we do not yet know. Assuming the facts as I have in this letter, however, the President could have reasonably concluded that FISA, as applied, would impermissibly impede his ability to carry out his constitutional responsibility to collect foreign intelligence and protect the Nation from attack.

It is difficult to predict accurately what the Supreme Court would do, particularly without knowing the facts of a particular case, or whether the Court would decline to intervene at all in what it might judge to be a separation-of-powers dispute over the NSA Program best left to the two "political" branches of government. That said, based on previous separation-of-powers decisions and Fourth Amendment decisions concerning "reasonability," I would expect the key factors to be:

- Whether the President, advised by intelligence professionals, reasonably concluded that the information collected by the NSA Program was important to identifying, and preventing, terrorist activities directed against the United States, here or abroad;

- If so, whether abiding by all provisions of FISA would negate or significantly impede the President's ability to gather such information in a sufficiently timely way to thwart such activities; and

- Whether the President reasonably concluded there was no reasonable alternative to the NSA Program, consistent with FISA's requirements, available to the Executive Branch.

17

If the President could reasonably answer all three of these questions in the affirmative, I believe the President would have been justified in anticipating that the Supreme Court would find the NSA Program constitutional or, put conversely, an interpretation of FISA foreclosing the NSA Program unconstitutional. Armed with that reasonable anticipation of the Supreme Court's ultimate decision, the President would have been constitutionally empowered, if not obligated, to decline to carry out FISA's requirements. As legal advice given to President Clinton indicates, the President was not required to make any announcement of his decision, except in the time, manner, and form of his choosing. In declining to carry out FISA's requirements under these circumstances, far from acting criminally, the President would have, in every sense, acted lawfully and constitutionally.[65]

It is my hope that the perspectives raised, and authorities cited, in this letter will assist the Congress in the separation-of-powers debate already underway.[66]

Sincerely,

H. Bryan Cunningham

18

*See curriculum vitae*, attached hereto. I currently practice information and homeland security law in Denver, Colorado. www.morgancunningham.net

[2] I note that I had no knowledge of the NSA program while in government, and have received no classified information about it.

[3] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952). Today, there is a good deal more Supreme Court law, and Executive Branch interpretation of it, than was available to Justice Jackson in 1952, the vast majority of it supportive of the views articulated in this letter.

[4] Although at least one press report has suggested that some small percentage of the electronic surveillance under the NSA Program may have involved communications where both parties were physically located in the United States, to my knowledge, there has been no allegation that any such interceptions were deliberate, but only that they were done, if at all, mistakenly.

[5] I take no position in this letter on the following issues widely discussed to date: (a) the degree to which FISA foreclosed reliance on statutes other than FISA and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") to conduct the NSA Program; (b) whether the AUMF in any way augmented to conduce the NSA Program or otherwise altered, FISA; (c) the general scope of the constitutional powers and responsibilities of the President as Commander-in-Chief versus Congress under its enumerated authorities; or (d) the reasonableness of the NSA Program under the Fourth Amendment. While I have views on each of these issues, I believe that they have been sufficiently discussed, on both sides of each issue and that, in contrast to the issues discussed in this letter, I have little to add to the debate.

[6] *See Webster v. Doe*, 486 U.S. 592, 605-06 (1988) (O'Connor, J. concurring).

[7] *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936).

[8] *See, e.g.*, January 9, 2006 *Letter to Members of Congress*, from 14 law professors and others currently in private sector, including Curtis A. Bradley, David Cole, and Walter Dellinger, former Assistant Attorney General, Office of Legal Counsel to President Clinton ("the Cole-Dellinger Letter"), ("Where Congress has . . . [regulated electronic surveillance] the President can act in contravention of statute only if his authority is *exclusive*, and not subject to the check of statutory regulation." at 2 ); January 5, 2006 Congressional Research Service Memorandum entitled "Presidential Authority to Conduct Warrantless Electronic Surveillance to Gather Foreign Intelligence Information ("CRS Surveillance Memo"); January 3, 2006 Letter from Jeffrey H. Smith to Members of the House Permanent Select Committee on Intelligence ("Smith Letter") ("[Because] Congress has the authority to 'make rules for the Government and regulation of the land and naval forces,' [and other enumerated constitutional powers], [and because] Congress intended FISA to be the exclusive means by which electronic surveillance of U.S. persons within the United States may be conducted, . . . the President lacks the residual constitutional authority to conduct [it]." at 10 (emphasis added) available at http://www.rawstory.com/exclusives/nsaspynmemo.pdf; January 26, 2006 Internet posting by Peter P. Swire, entitled "Legal FAQs on NSA Wiretaps" ("Swire Memorandum") ("In short, it is a crime to conduct wiretaps in the United States, of U.S. citizens, unless there is a statutory basis for doing so. There was no statutory basis [for the NSA Program]." at 2) available at http://www.americanprogress.org/site/pp.asp?c=biJRJ8OVF&b=1389573; and "A Legal Analysis of the NSA Warrantless Surveillance Program," Morton H. Halperin, January 5, 2006 ("Halperin Letter") ("[The Administration's] claim of inherent authority might have some plausibility had Congress not acted so decisively to prohibit warrantless surveillance of US persons in the United States when it enacted FISA." at 5), available at www.soros.org. I refer to these published legal analyses collectively as "the Commentators". There is, of course, some variation between the articulation of these fundamental points between and among the Commentators quoted here, as well as in the degree of certainty and stridency (i.e., accusing the President of deliberate criminal behavior) expressed in each of the individual sources cited. Except as directly quoted, I do not mean to ascribe my specific formulation to any particular source cited. However, I believe the immediately preceding summary to be a fair representation of the general thrust of the Commentators' argument.

[9] Not all who have previously published legal analyses believe the President's actions violated the Constitution or were illegal, and the critiques do not break down easily along partisan lines. *See, e.g.*, December 21, 2005 editorial by former Associate Attorney General to President Clinton John Schmidt asserting the legality, and consistency with

past practice in other Administrations, of the NSA Program. Available at: http://www.weeklystandard.com/weblogs/TWSFP/2005/12/clinton_associate_attorney_gen.html.

[10] *supra* note 8.

[11] Opinions of the DOJ Office of Legal Counsel are widely recognized as legally binding across the Executive Branch. *See, e.g.,* Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel,* 52 Admin. L. Rev. 1303, 1318 (Fall 2000) ("In the overwhelming majority of cases, when the views of the Attorney General or the Office of Legal Counsel are sought, all understand that those views will conclusively resolve the legal question presented, short of subsequent judicial review)".

[12] Reaffirming this constitutional authority apparently was sufficiently important to President Clinton's Administration that Assistant Attorney General Dellinger wrote an entire opinion about it, even though the opinion does not identify any particular statute at issue at the time. *Presidential Authority to Decline to Execute Unconstitutional Statutes,* 4A U.S. Op. OLC 55, November 2, 1994. The cited quote is from page 2 of that opinion (emphasis added).

[13] I personally have worked with or for a number of the lawyers I describe in note 8 as "the Commentators." Those whom I know are honorable individuals, and talented and experienced lawyers, and, no doubt, are articulating the law as they honestly believe it to be. I take no issue with any of them personally. I simply believe that, in the case of the NSA Program, their constitutional analysis is incomplete and flawed, and I feel it important to make Congress aware of additional, relevant, constitutional and legal authority.

[14] *Supra* note 3, at 635-38.

[15] *Id.* at 635.

[16] *Id.* at 637.

[17] *Id.*

[18] *Id.* at 637-38.

[19] Such a result has been flatly rejected by a number of federal court decisions, *e.g., Earth Island Inst. v. Christopher,* 6 F.3d 648, 652-53 (citing *Curtiss-Wright* and holding: "The district court correctly ruled that the section 609(a) claims relate to 'the foreign affairs function, which rests within the exclusive province of the Executive Branch under Article II, section 2 of the United States Constitution.' The statute's requirement that the Executive initiate discussions with foreign nations violates the separation of powers; and this court cannot enforce it").

[20] 50 U.S.C. § 1541(c) (recognizing, in the War Powers Act, the President's constitutional authority to respond militarily, without statutory authorization, to a "national emergency created by attack upon the United States, its territories or possessions, or its armed forces"); In any event, "[t]he Executive Branch has traditionally taken the position that the President's power to deploy armed forces into situations of actual or indicated hostilities is not restricted to the three categories specifically marked out by the [War Powers] Resolution'. *Proposed Deployment of United States Armed Forces Into Bosnia,* 19 U.S. Op. OLC 327 (1995), at 7 (citing *Overview of the War Powers Resolution,* 8 Op. OLC 271, 274-75 (1984); *War Powers: A Test of Compliance: Hearings Before the Subcomm. on International Security and Scientific Affairs of the House Comm. on International Relations,* 94th Cong., 1st Sess. 90 (1975) (statement of Monroe Leigh, Legal Adviser, Department of State)).

[21] "The power of the executive to establish rules and regulations for the government of the army, is undoubted." *United States v. Eliason,* 41 U.S. 291, 301 (1842) (cited with approval in *Loving v. United States, infra* note 47 at 767 ("Congress . . . exercises a power of precedence over, not exclusion of, Executive authority").

[22] *Placing of United States Armed Forces Under United Nations Operational or Tactical Control,* 20 U.S. Op. OLC 182, *2 (1996), 1996 WL 942457.

[23] This type of more nuanced, balancing approach was explicitly endorsed, as a description of Supreme Court separation-of-powers analysis, by Justice Kennedy's concurring opinion in a 1989 separation-of-powers case. In *Public Citizen v. Department of Justice,* Justice Kennedy, citing a number of Supreme Court cases decided well after *Youngstown,* opined: "In some of our more recent cases involving the powers and prerogatives of the President, we have employed something of a balancing approach, asking whether the statute at issue prevents the President 'from accomplishing [his] constitutionally assigned functions' . . . . and whether the extent of the intrusion on the President's powers 'is justified by an overriding need to promote objectives within the constitutional authority of Congress." 491 U.S. 440, 484 (1989) (citations omitted).

[24] *Youngstown, supra* note 3, at 637.

[25] Influential as Justice Jackson's opinion has been in helping judges make sense out of complex constitutional questions, it was not the majority opinion in *Youngstown* and, as such, it's effect as binding precedent is not as great as it might be. The Supreme Court, in 1981, did cite *Youngstown* approvingly in a majority opinion, enhancing its status. The Court there, however, in *Dames & Moore v. Regan*, only quoted the part of Justice Jackson's analysis discussing Zone 1. It is unclear, therefore, how much of the analysis is binding. 453 U.S. 654, 678 (1981).

[26] *See, e.g., United States v. Brown,* in which the Court of Appeals for the Fifth Circuit, in upholding the President's inherent constitutional authority to order warrantless foreign intelligence wiretaps, articulated the longstanding constitutional principle that "[r]estrictions upon the President's power which are appropriate in cases of domestic security become artificial in the context of the international sphere." 484 F.2d 418, 426 (5th Cir. 1973).

[27] *See, e.g., infra* note 42, at 540-41 ("[t]he great bulk of the substantive powers wielded by the executive branch in the domestic arena stems from acts of Congress, and as long as Congress refrains from interfering with the President's constitutional duties of appointment and supervision it has substantial freedom to grant, withhold, and condition domestic authority to the executive. Other than issuing pardons and making state of the union addresses, the President can do very little domestically without congressional authorization. In the areas of foreign affairs and national security, by contrast, constitutional text and structure vest the President with substantive constitutional authority not dependent on congressional enactments, while Congress itself, of course, possesses a variety of relevant powers. When separation of powers questions arise in these areas, therefore, their resolution requires the interpreter to give due weight and proper respect to executive and legislative powers of equal constitutional dignity").

[28] *Youngstown, supra* note 3, at 582-84.

[29] *Id.* at 588.

[30] *Id.*

[31] *Id.* at 643 (though Justice Jackson notes also Congress' power to raise and support armies and establish and maintain a Navy, his is not the majority opinion in the case and, thus, not controlling on this point).

[32] *Id.*

[33] Admittedly, treating the Commander in Chief and foreign affairs powers as completely separate authorities would be inaccurate and artificial. Any serious assessment of the President's constitutional authority to authorize the NSA Program, however, must include an understanding of the foreign affairs power, and how the Supreme Court and Administrations of both political parties, over decades, have viewed that power, and Congressional attempts to regulate its use.

[34] *U.S. Constitution,* art. II, section 1, clause 8.

[35] Indeed, the founders of our republic specifically recognized the primary position of the President in the field of foreign affairs. For an excellent discussion of this history, *see* Powell, H. Jefferson, *The Founders and the President's Authority over Foreign Affairs.* William & Mary Law Review, Vol. 40, pp. 1471-1537 (May 1999).

[36] 22 U.S. Op. Atty. Gen. 13, 25-26, *Foreign Cables,* (1898) (citing, *inter alia, Cunningham v. Neagle,* 135 U.S. 1 (1890)) (emphasis added).

[37] 484 US 518, 527, 530 (1988).

[38] 339 U.S. 763, 789 (1950) (emphasis added).

[39] 299 U.S. 304, 320 (1936) (emphasis added).

[40] *Egan, supra* note 37 at 527, 530.

[41] *Supra* note 26 (emphasis added) (citations omitted). The Commentators argue that the numerous federal appeals court decisions prior to the passage of FISA reiterating the President's inherent constitutional authority to authorize warrantless electronic surveillance for foreign intelligence/national security purposes are not dispositive today, because of the intervening passage of FISA. As conceded by the Congressional Research Service in its memorandum expressing doubt about the legality of the NSA Program, however, because "the [Foreign Intelligence Surveillance] Court of Review is a court of appeals and is the highest court with express authority over FISA to address the issue, its reference to inherent constitutional authority for the President to conduct warrantless foreign intelligence surveillance might be interpreted to carry great weight." *CRS Surveillance Memo; supra* note 8, at 30. The FISA Court of Review decision was issued in 2002, more than 20 years after the passage of FISA and is, of itself, strongly supportive of the constitutionality of (and, therefore, legality) of the NSA Program. Whatever the merit of the Commentators' position on the relevance of pre-FISA court of appeals decisions regarding the issue of the

legality of warrantless electronic surveillance for foreign intelligence purposes, however, neither the passage of FISA, nor any other intervening event, undermines the authority of pre-FISA court of appeals decisions on the President's foreign affairs and foreign intelligence authorities generally.

[42] Particularly notable in this area is the body of work of Professor H. Jefferson Powell of Duke University Law School. While I do not claim to know whether Professor Powell would agree with any views expressed in this letter, I am indebted, for much of the legal analysis presented herein, to Professor Powell's exhaustive 1999 article *The President's Authority Over Foreign Affairs: An Executive Branch Perspective*, 67 Geo. Wash. L. Rev. 527. In addition to the exhaustive research that underlies it, Professor Powell's article is additionally interesting due to his previous government service. Professor Powell served in senior legal positions under President Clinton, as Principal Deputy Solicitor General from July 1996 through September 1996, and as Deputy Assistant Attorney General in the Office of Legal Counsel from June 1993 through June 1994, and January 1996 through September 1996.

[43] *Webster v. Doe*, *supra* note 6, 605-06 (emphasis added) (*citing* prior Supreme Court decisions in *United States v. Curtiss-Wright Export Corp.*; *Department of Navy v. Egan*; and *Totten v. United States*, 92 U.S. 105 (1876)).

[44] To be sure, what Professor Powell has called the "Executive Branch Perspective" concerning the President's constitutional foreign affairs authority is not universally shared. According to Professor Powell, as of 1999, "the conventional wisdom in recent scholarship" rejected "any interpretation of the Constitution that accords the President primary constitutional responsibility for the formulation of United States foreign policy. Powell, *supra* note 35 at 1 (Professor Powell cites several examples of what he calls the "congressional primacy" view in his William and Mary Law Review article, *supra* note 35). The problem, as Professor Powell notes, for those espousing this "congressional-primacy" view of constitutional foreign affairs authority, is that, to do so requires one to "repudiate or distinguish away most of what the Supreme Court appears to have said on the subject. *Id.*

[45] For important elements of the separation-of-powers analysis in this letter, I am indebted to the excellent work of David S. Kris, a former senior Department of Justice attorney in the Administrations of Presidents Clinton and George W. Bush, though I do not know whether he would agree with any of the views expressed herein.

[46] *Clinton v. Jones*, 520 U.S. 681, 697 (1997).

[47] *Loving v. United States*, 517 U.S. 748, 757 (1996).

[48] *Supra* note 46, at 699-700.

[49] *Id.* at 699.

[50] *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1947). The Supreme Court, in *Clinton v. Jones*, directly cited *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982). Decades after *Youngstown*, this same Supreme Court decision — *Chicago & Southern Air Lines* — was cited by one of the several federal courts of appeals to uphold the President's inherent constitutional authority to order warrantless electronic surveillance for foreign intelligence purposes: *United States v. Brown*, *supra* note 26, at 426 (relying in part on *Chicago & Southern Airlines*, the court held that "because of the President's constitutional duty to act for the United States in the field of foreign relations, and his inherent power to protect national security in the context of foreign affairs, we reaffirm that the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence").

[51] *Clinton v. Jones*, *supra* note 46, at 701.

[52] *Id.* at 697-98 (I do not by any means suggest here, as President Clinton's counsel seemed to in *Clinton v. Jones*, that any President is temporarily "immune" from the actions of a co-equal branch of government. Rather, as discussed below, I believe our Constitution requires that, when one branch of government unconstitutionally encroaches on another, the other branch is constitutionally empowered to resist such encroachment).

[53] *Id.* at 701.

[54] *Id.* at 702.

[55] H.R. Conf.Rep.No. 95-1720, at 35, *reprinted in* U.S.C.C.A.N., 4048, 4064.

[56] *Supra* note 12.

[57] *Id.* (emphasis added).

[58] *Id.*

22

[59] *Id.* at 2 (emphasis added) (the opinion went on to say that "[s]ome legislative encroachments on executive authority, however, will not be justiciable or are for other reasons unlikely to be resolved in court. If resolution in the courts is unlikely and the President cannot look to a judicial determination, he must shoulder the responsibility of protecting the constitutional role of the presidency").

[60] *Id.* at 2.

[61] *Id.* at 3-4 (emphasis added) (citations omitted). To conclude that a President is constitutionally permitted not to seek court approval for an activity where Congress has directed that he do so, or to not discuss publicly a decision to decline to execute an unconstitutional statute does not, of course, suggest that these are the best course of action in any particular case. Generally speaking, I believe that the greater the involvement of all three co-equal branches of government, and awareness by the public, of significant national security decisions, the better. Without knowing all the operational and security considerations involved with the NSA Program, it is impossible to say what the best course of action would have been in this case. In any event, the purpose of this letter is neither to condemn or endorse how the NSA Program has been handled, but only to bring to the debate additional constitutional and legal perspective.

[62] *Infra.* note 64.

[63] *Id.* Much has been made in public discussions about the NSA Program about the criminal penalties for violations of FISA, with some even suggesting current government officials have committed criminal acts. In that context, it is worth noting that Title III, which President Clinton was advised he could disregard as unconstitutional if applied in a particular way, carries precisely the same criminal penalty – five years' imprisonment – as FISA. *Compare* 18 U.S.C. § 2511 with 50 U.S.C. § 1809.

[64] *Sharing Title III Electronic Surveillance Material With the Intelligence* Community, 2000 WL 33716983 (OLC), October 17, 2000, at 9 (emphasis added) (citing *Rainbow Navigation, Inc. v. Department of the Navy*, 783 F.2d 1072, 1078 (D.C. Cir. 1986).

[65] The bipartisan leadership of both houses of Congress, as well as the bipartisan leadership of both Congressional intelligence oversight committees, agree that they were briefed repeatedly by the Administration on the NSA Program, though there is, based on media reports, some disagreement about the scope and effect of those briefings. Based on media reports, succeeding Chief Judges of the Foreign Intelligence Surveillance Court also were briefed about the NSA Program.

[66] I am indebted to three exceptional lawyers, Diane Lewis Waters, Esq.; Amanda M. Hubbard, Esq., Fulbright Scholar, Norwegian Research Center for Computers and Law,; and Andrew C. McCarthy, Senior Fellow, Foundation for the Defense of Democracies for their insight and long hours of review and editing assistance. The views expressed herein, as well as any errors, are mine alone.

cc:   The Hon. Bill Frist
      Majority Leader
      United States Senate
      Washington, D.C. 20510

      The Hon. J. Dennis Hastert
      Speaker
      U.S. House of Representatives
      Washington, DC 20515

      The Hon. F. James Sensenbrenner, Jr.
      Chairman
      Judiciary Committee
      U.S. House of Representatives
      Washington, DC 20515

      The Hon. Pat Roberts
      Chairman
      Select Committee on Intelligence
      United States Senate
      Washington, D.C. 20510

      The Hon. Peter Hoekstra
      Chairman
      Permanent Select Committee
      on Intelligence
      U.S. House of Representatives
      Washington, D.C. 20515

The Hon. Harry Reid
Minority Leader
United States Senate
Washington, D.C. 20510

The Hon. Nancy Pelosi
Minority Leader
U.S. House of Representatives
Washington, DC 20515

The Hon. John Conyers
Ranking Minority Member
Judiciary Committee
U.S. House of Representatives
Washington, DC 20515

The Hon. John D. Rockefeller, IV
Vice Chairman
Select Committee on Intelligence
United States Senate
Washington, D.C. 20510

The Hon. Jane Harman
Ranking Minority Member
Permanent Select Committee
on Intelligence
U.S. House of Representatives
Washington, D.C. 20515

The Hon. Alberto R. Gonzales
Attorney General of the United States
Main Justice Building
950 Pennsylvania Ave., N.W.  20530

24

███████████████████ (OGC) (FBI)

From: ███████████████ (DO) (OGA)
Sent: Wednesday, February 01, 2006 8:13 AM
To: CAPRONI, VALERIE E. (OGC) (FBI)
Subject: RE: Excerpt from 12/19/05 briefing/Q&A

UNCLASSIFIED
NON-RECORD

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 11/29/07 BY 65179 DMH/PLB/TAC

good

-----Original Message-----
From: CAPRONI, VALERIE E. (OGC) (FBI)
Sent: Wednesday, February 01, 2006 8:12 AM
To: ███████████ (DO) (OGA)
Subject: RE: Excerpt from 12/19/05 briefing/Q&A

UNCLASSIFIED
NON-RECORD

Cooler (or something) heads have prevailed. This isn't a problem.

-----Original Message-----
From: ███████████ (DO) (OGA)
Sent: Tuesday, January 31, 2006 7:08 PM
To: CAPRONI, VALERIE E. (OGC) (FBI)
Subject: Excerpt from 12/19/05 briefing/Q&A

UNCLASSIFIED
NON-RECORD

Q: will you release . . . .the declassified versions of the legal rationale for this from OLC? And if not, why not? To assure the American public that this was done w/ the legal authority that you state.

A: (AG): We're engaged now in a process of educating the American people, again, and educating Congress. We'll make the appropriate evaluation at the appropriate time as to whether or not additional information needs to be provided to the Congress or the American people.

Q: You declassified OLC opinions before, after the torture -- why not do that here to show, yes, we went through a process?

A: (AG): I'm not confirming the existence of opinions or the non-existence of opinions I've offered up today our legal analysis of the authorities of the President.

UNCLASSIFIED

UNCLASSIFIED

UNCLASSIFIED

1

FBI 3300